### BLISS v. ANACONDA COPPER MINING CO. et al.†

(Circuit Court, D. Montana. January 25, 1909.)

1. EQUITY (§ 409*)—REFERENCE WITHOUT CONSENT—FINDINGS OF MASTER.

   Where an equity cause is referred to a master without the consent of both parties, his findings are merely advisory.

   [Ed. Note.—For other cases, see Equity, Cent. Dig. § 921; Dec. Dig. § 409.*]

2. INJUNCTION (§ 14*)—GROUNDS OF RELIEF—DISCRETION OF COURT.

   While there is no doubt of the jurisdiction and power of a court of equity to enjoin the continuance of a business, although lawful, upon the reasonable certainty of irreparable injury to the property or rights of another, the writ of injunction is not ex debito justitiæ for any injury threatened or done to land or rights of a person, but the granting of it must always rest in sound discretion, governed by the nature of the case, and the court in the exercise of such discretion will consider all of the circumstances, the consequences of its actions and the real equity of the case.

   [Ed. Note.—For other cases, see Injunction, Cent. Dig. § 14; Dec. Dig. § 14.*]

3. INJUNCTION (§ 1*)—GROUNDS OF RELIEF—DISCRETION OF COURT.

   The maxim that one must so use his rights as not to infringe upon the rights of another must be upheld by preserving the absolute right to recover judgment for damages, wherever substantial injury is shown; but

---

there is no inconsistency between this principle and that which makes the writ of injunction a matter for the sound discretion of the court.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 1; Dec. Dig. § 1.*]

4. INJUNCTION (§ 208*)—REMEDIES OF OWNERS OF PROPERTY—DECREE.

Where there are two citizens, each of whom is engaged in a lawful business, one in mining and the other in farming, and there comes a conflict when neither can enjoy his own property without interfering to some extent with his neighbor in the enjoyment of his, the court in determining their respective rights should, where possible, so frame its decree as to avoid the destruction of the rights of either.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 427; Dec. Dig. § 208.*]

5. NUISANCE (§ 80*)—ENJOINING LAWFUL BUSINESS—COMPARATIVE INJURIES.

Complainant, the owner of a farm, which he rented, situated in Deer Lodge valley, Montana, brought suit to enjoin the maintenance and operation by defendants of the Washoe copper smelter, on the edge of the valley, on the ground that the fumes and the arsenic precipitated from the smoke from the smelter injured the crops and forage on the farm and poisoned the stock thereon, as well as on the other farms in the valley, and made it a public nuisance. The suit was in reality brought as a test case on behalf of a large number of farmers who were joined in an association. The evidence showed that some injury had resulted to complainant's and other farms in the valley, within the so-called "smoke zone," but that it had been lessened to a large extent by a reconstruction of the plant some two years prior to the suit at large expense, and that since that time the injury to farms in the valley had not been so serious as to render farming and stock raising thereon unprofitable. The smelter was built at a cost of nearly $10,000,000, and treated about 7,000 tons of ore per day, being practically all of that produced in the Butte district, and its production of copper was from 17 to 20 per cent. of that in the United States. The operation of the smelter and the mines tributary thereto constituted one of the chief industries of the state, on which a large part of the population of Butte and Anaconda and the farms in the vicinity were dependent for a livelihood. It appeared that no better location for the smelter, if as good, could be found elsewhere, and that it was essential to the successful operation of the mines; and it also appeared that the result of granting an injunction as prayed would be to put the complainant and other landowners and farmers in a position where they can compel the defendants either to buy all the lands of the farmers at their own price or lose their own vast property. *Held*, that an injunction restraining the operation of the smelter would not be granted on the facts shown, but that, if it appeared that any equitable adjustment of the rights of the parties could be made, the case would be retained for that purpose.

[Ed. Note.—For other cases, see Nuisance, Cent. Dig. § 192; Dec. Dig. § 80.*]

In Equity. On final hearing.

R. L. Clinton and C. M. Sawyer, for complainant.
C. F. Kelley, Forbis & Evans, and A. J. Shores, for defendants.

HUNT, District Judge. Fred J. Bliss, a resident and citizen of Idaho, instituted this suit on the 4th day of May, 1905, against the Anaconda Copper Mining Company and the Washoe Copper Company, Montana corporations, and prayed for permanent injunction forever restraining and enjoining the defendants from operating a certain smelting plant situated near the city of Anaconda, Mont., and from

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

treating ores described as containing poisonous and deleterious substances, and for general relief.

The substance of the more important allegations of the bill is: That complainant owns about 320 acres of land, situated about five miles in a northeasterly direction from the Washoe copper smelter, operated by defendant Anaconda Copper Mining Company, in Deer Lodge valley, Deer Lodge county, Mont. That before the construction of the said smelting plant, Deer Lodge valley, and a large area thereof designated by complainant as the "smoke zone," was a rich and fertile farming country, well watered, adapted to the raising of all live stock, and that there was a ready sale at good and profitable prices for all farming products and live stock raised in the valley. That commencing about September 1, 1903, and ever since, defendants have been treating and reducing in the Washoe smelter about 7,000 tons of ore a day, containing large quantities of arsenic, sulphur, and other noxious and poisonous substances, and that the said smelter was constructed so near to the farming neighborhood described that large quantities of sulphur, sulphuric acid, sulphurous acid, arsenic, copper, and other poisonous substances were carried out through the flues connected with a large smelter stack and discharged into the atmosphere, which substances were carried by the wind over and upon the said farming region in Deer Lodge valley, depositing large quantities of acids and poisons over the said portion of the Deer Lodge valley, and more especially upon complainant's lands, poisoning the pastures and burning and dwarfing the crops growing on his premises during the summer of 1904, and poisoning all the soil of said premises and of Deer Lodge valley in the "smoke zone," and the hay, grasses, and grain growing thereon, poisoning all the live stock in the said area, causing large numbers of horses, sheep, cattle, and swine, so poisoned, to sicken, and a great many to die, so that the said area of Deer Lodge valley is rendered wholly worthless for stock raising or farming purposes. That more than 100 farmers live in the said "smoke zone" and own and possess more than 50,000 acres of improved farming lands therein. That all of said farmers are situated as is the complainant, and are similarly affected by said smoke and fumes from the Washoe smelter, and that the smoke and smelter fumes affect at the same time all of said farming neighborhood. That no one farmer could prepare his case for trial without great expense, and that, as several suits would have to be instituted from year to year to recover damages for loss of crops and live stock, complainant would not be able to institute or maintain the same, owing to the great expense entailed. That, if the smelter continues to operate, the lands and soil in the "smoke zone" will each year become more highly impregnated with such poisonous substances, until no crop or vegetation can be produced. That more than $2,000,000 worth of real and personal property owned by the farmers is situated in the said "smoke zone" and is being damaged and destroyed by the smelter fumes and poisonous ingredients contained therein, and that all will ultimately be entirely destroyed by the continued operation of the said smelter. That the homes of the farmers will be destroyed, and that they will be compelled to leave the Deer Lodge valley, because they will not be able to make livings for their families. That the smelter fumes and the

poisonous ingredients have killed nearly all of the trees in the said "smoke zone," as well as injured and killed the timber and trees for many miles around the smelting plant, rendering the valley barren. That the rental value of the complainant's lands prior to the construction and operation of the smelter was $1,000 per annum, but that the present rental value would not exceed $300 per annum. That since 1903 the lands of complainant have been damaged to the extent of $20 per acre, or a total permanent damage to said lands of $6,400. That complainant and the other farmers similarly situated have no adequate remedy at law. That, if the smelter should close its operations, the farms, in the course of time, could be restored to their former productivity. That there are many places in Montana where smelting plants could be operated without damage to the adjacent country. And that the poisonous substances complained of can be precipitated and impounded at the said smelter plant with very little extra or additional cost to the defendants in the treatment of said ores.

The defendants, by answer, plead, among other things, that some quantities of the poisonous and noxious substances mentioned in the bill are discharged into the air through the stack of the Washoe smelter, and that the smoke containing such substances is carried and disseminated over a very large area of country, including, at times, the area termed by the complainant "smoke zone." They deny, at length, that since 1903, any injury of any kind, whatsoever, has been done or will be done to the complainant's property, or to the property of anybody in the Deer Lodge valley, by the smelter emanations. They plead that they have no other works available for smelting ores mined by them, that they have adopted the most modern methods for treating ores, and they aver their willingness to continue to do all within their power to prevent possible injury or annoyance to the inhabitants of the valley. They allege solvency, and set up in detail equitable defenses, saying, in effect, that, if the works were to be closed, great injury would be done to the cities of Anaconda and Butte, and to Deer Lodge and Silver Bow counties, and to the interests of the people residing in those and other parts of the state, and that the revenues of the state would be affected; deny that the deleterious substances mentioned in complainant's bill could be precipitated or impounded with better results than at present; and say that, if the plant should have to be removed, it would amount to a practical destruction of their property, and that, if the smelter is not allowed to operate, it will be impossible for the ores which are now treated at the Washoe smelter to be treated profitably elsewhere, and that it is impossible to select any more convenient or suitable site than the present. Complainant filed a replication, averring that he would maintain and prove the allegations of his bill.

After the presentation and decision of motions, trying the form and substance of various averments of the pleadings, the court, against the objection of the complainant, on December 18, 1905, referred the cause to the standing master in chancery, O. T. Crane, with directions to take the testimony and to find the material facts and report the same to the court. In pursuance of this order, the taking of testimony commenced on January 15, 1906, and continued from time to

time thereafter until about March 20, 1907. Thereafter, arguments were had before the master, and on June 1, 1907, the case was submitted to him. On January 10, 1908, the master filed his findings.

The most important of the master's findings are: That the sulphur in the smoke from the smelter stack has caused no damage or injury to the crops on complainant's land since the remodeling of the Washoe smelter in 1903; but that arsenic was deposited at times upon complainant's farm in a way to injure the fodders grown thereon. That live stock was poisoned from the effects thereof, and a portion of the Deer Lodge valley was less valuable for stock raising and grazing purposes than it otherwise would be, by reason of the operation of the smelter. That the complainant, Bliss, has suffered special damage in the sum of $350, in the depreciation of the rental value of his land. That the farmers in the Deer Lodge valley constitute a neighborhood, and that arsenical fumes emitted by the smelter more or less injuriously affect all hay, grass, and fodder in the neighborhood. That, if the smelter continues as now operated, the future crops will be more or less poisoned, and the live stock will be sickened; but that, if the smelter should close, the effect of the poisonous matters would cease. That there has been no injury to the soil of any permanent character. That in 1901 complainant's land was worth not to exceed $8,000, and at the time of the suit it was worth not to exceed $4,000, because of the improper farming done, and because of the injury from the arsenical emanations from the smelter. He finds that in 1904 the farmers of Deer Lodge valley formed themselves into an association to procure evidence and prosecute claims and suits against the defendants on account of the maintenance and operation of the smelter, that this suit was brought mainly for the benefit of the farmers' association, that Bliss himself was not a member thereof, and that the control of this action has been exercised by Smith, president of the farmers' association, in the interest of the association. The findings set forth: That the present processes used at the Washoe smelter are the only practical ones that can be followed in the reduction of the ores treated; that there is no site in Montana that could be selected where operations could be carried on with less damage and inconvenience; that the mines in Butte have their ores smelted principally at the Washoe smelter; that, if the smelter were to close, two-thirds of the mining operations in Butte would stop; that irreparable injury would be done to the complainant and others owning property in Deer Lodge valley, because of the loss of markets for the products of their lands; that the value of their lands would be depreciated; and that the damage which would accrue to them would be greatly in excess of the damage they would sustain by reason of the continuance of the smelter, as it is now operated.

·Thereafter counsel for complainant and for defendants, respectively, filed exceptions and objections to the findings and report of the master. The exceptions amounted, in substance, to this: That some of the findings of fact were against the weight of evidence, that some were not supported by the evidence, that the findings were defective

in not covering certain issues, and that others were upon immaterial and irrelevant issues.

The case, having been referred to the master without the consent of the parties, is conceded to be one where the findings reported are merely advisory, and where the court may adopt the information communicated by the master's findings upon the evidence, and may accept the same or disregard it, in whole or in part, according to its judgment, as to the weight of evidence. Such is the rule as declared by the Supreme Court in Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764, and as recognized by this court when it denied this complainant's motion for an order to require the master to file his findings of fact without setting a time to receive exceptions to his report. Bliss v. Anaconda Copper Min. Co. et al. (C. C.) 156 Fed. 309.

Having accepted the view therefore that the case is for final decision upon the pleadings and proofs, counsel for the respective parties, in their elaborate and able arguments, have addressed themselves to the whole record, referring however, to many of the findings of the master as correct and acceptable to both sides, yet alluding to others as foundation aids only upon the issues involved, not casting the burden upon either of the parties in their exceptions, and not like the findings of an independent tribunal, to be taken as presumptively correct, only to be disturbed where clearly in conflict with the weight of the evidence upon which they were made. These considerations are the law applicable to the method of approaching the investigation of the record. The learned master, himself, took this view of the effect of the reference; and it is just to him to say that his work has been of such a helpful character that counsel, throughout their arguments, have recognized the vast amount of painstaking study which he has evidently given to the testimony, and have accorded to his findings the most respectful attention.

Two hundred and thirty-seven witnesses testified. The evidence covered a very wide scope, reaching out, not only to the substantive question whether the single complainant, Bliss, has suffered special injury because of the smelter fumes blowing over his land, but whether, as a truth, because of the fumes blowing over the farms of others, injury has been done, and the Washoe smelter is a public nuisance, as defined by the law. Farmers and stock raisers from within the neighborhood of the Deer Lodge valley gave evidence as to what they observed or knew, and scientists of the widest experience advanced their views in the general and technical diseases of live stock, and in agriculture, chemistry in its various technical branches, toxicology, pathology, pathological histology, anatomy, botany, bacteriology, zoology, mineralogy, metallurgy, and in forestry.

Exhaustive examinations of each technical expert followed careful special study and preparation in the particular subject testified to, and nearly every assertion claimed to rest upon scientific learning and research was challenged by cross-examination, and disputed by experts produced upon the opposite side. Under the circumstances, we can well understand that jealous regard which many of them observed for

nicety of distinction, and why, too, a number of them were exceedingly cautious in declining to give opinions which called for expert knowledge one whit outside of the technique of their respective specialties. Among the expert witnesses who testified may be mentioned: Prof. Joseph Blankenship, of the Agricultural College of Montana; Prof. Charles A. Doremus, of New York; Prof. M. J. Elrod, of the University of Montana; Dr. Robert J. Formad, of the United States Bureau of Animal Industry; Prof. W. D. Harkins, of the University of Montana; Dr. M. E. Knowles, state veterinarian of Montana; Dr. Duncan McNab McEachran, of the Canadian government veterinarian service; Dr. V. A. Moore, of Cornell University; Dr. Leonard Pearson, of the University of Pennsylvania, and state veterinarian of Pennsylvania; Dr. D. E. Salmon, formerly head of United States Bureau of Animal Industry; Dr. Harry Snyder, of the University of Minnesota; Dr. Ralph E. Smith, of the University of California; Dr. Theobald Smith, of Harvard University; Dr. R. E. Swain, of Leland Stanford, Jr., University; and Prof. F. W. Traphagen, of the Colorado School of Mines.

Exhibits, more than 800 in number, accompany the record. There are numerous specimens of bones, animal tissue, consisting, in part, of stomachs, noses, sections of arteries, livers, kidneys, etc., flue dust, of normal and abnormal plant life of the Deer Lodge valley, and of portions of trees and shrubs; while hundreds of photographs were used to illustrate varieties of conditions relevant to the issues.

To enter upon a detailed statement of the testimony, which alone covers over 25,000 pages, would be to extend this opinion far beyond what is necessary. It would require copious extracts from the direct and cross examinations of many witnesses. Conflicts of reason would have to be set forth, apparent and real inconsistencies would have to be pointed out at length, and the train of reasoning which formed the bases for the seriously conflicting conclusions, and sometimes irreconcilable differences of opinion among scientific witnesses, could only be well and fairly set forth by lengthy and exact quotations from the elaborate, technical explanations. Therefore, to reduce the facts directly to as brief a statement as the record reasonably justifies, I have thought it proper to adopt the substance of those findings of the master which have not been excepted to, and, in a narrative way of my own, simply to state the case and to comment thereon as the weight of evidence warrants.

The Deer Lodge valley in Montana, where complainant's lands are situated, lies north and west from Butte, and northerly and easterly from Anaconda. The valley is high, (over 5,000 feet in altitude), between two ranges of the Rocky Mountains. It is generally regarded as extending from the Northern Pacific Railroad near Garrison southerly toward Butte for a distance of about 40 miles. Its average width is about 10 miles. The mountains about the valley have been extensively exploited by prospectors and miners. Settlements were made as far back as 1864, and during the years thereafter ranches were taken up by stockmen and farmers, so that now the valley is quite well settled; many farmers owning lands and homes therein. In the ear-

lier days, stock raising was the principal occupation of the ranchmen, but from 1880 on, as settlement increased, the ranges became poorer, fences became more common, larger herds of range stock were driven out to more open ranges, and, in a great measure, since about 1881, diversified farming has superseded stock raising. The valley is quite well watered, and is generally adapted to dairy and stock farming, and to the growing of hay, grain, alfalfa, and such garden produce as grows in the mountain valleys of this latitude. The city of Anaconda is in the southwesterly part of the valley upon Warm Springs creek, a mountain stream that flows into the Deer Lodge river. The Washoe smelter, which is said to be the cause of injury to complainant and others, stands on a slope of the mountains west of the valley, a mile and a half southeast of the city of Anaconda.

In 1883 and 1884 a corporation styled the "Anaconda Mining Company," not a defendant, operated a smelter near to the site of the Washoe smelter. The Anaconda Mining Company owned valuable properties in the vicinity of Butte, about 30 miles distant from Anaconda, and was working and developing mining claims which produced large quantities of low-grade ores, only capable of successful treatment by reduction works. These ores were in large part of such a character that, in order to reduce the same and extract the metal contents thereof, it was necessary to concentrate the same by the use of large quantities of water. It being deemed necessary for the Anaconda Mining Company to construct reduction works, extensive investigations were made by its agents for the purpose of fixing points where sufficient water could be obtained, and other natural facilities afforded, for the operation of such proposed works, and a place near where the city of Anaconda now stands was chosen as the best site.

The Anaconda Mining Company, without objection on the part of any one, proceeded to construct its smelting works, and expended in connection therewith several millions of dollars. In 1884, when the works were completed, the company began to treat, and did treat, down to the year 1895, thousands of tons of ore per day. The works of the said company were located upon the north bank of Warm Springs creek, at a point one mile in a northerly direction from the present Washoe smelter, and are spoken of throughout the testimony of the witnesses as the "old works," in contradistinction to the Washoe smelter. Between 1884 and 1895 the Anaconda Mining Company operated the works, but in 1895 transfer of the property was made by the Anaconda Mining Company to the Anaconda Copper Mining Company, a defendant herein.

Thereafter it was determined by the defendants to construct a new smelting plant upon more modern and economical lines than the old works had been constructed upon, for the purpose of reducing the ores mined by the defendant companies and other mining companies at Butte. Investigation was had, and the present site of the Washoe smelter was chosen as being the most available and suitable within Montana, and the Washoe smelter was constructed by the Washoe Copper Company, defendant, for the purpose of taking the place of the old works, heretofore referred to. The Anaconda Copper Mining

Company transferred its smelting operations to the Washoe smelter, and thereafter demolished the old works, and at the time of the hearing of the testimony in this suit had no other available means of smelting or reducing the ores then being treated and smelted by it than the Washoe smelter. Several years were consumed in erecting the Washoe smelter, and about $9,500,000 expended in its construction.

The ores treated and smelted at Anaconda since 1884 are sulphide copper ores, containing large quantities of sulphur and arsenic, quantities of which substances, in various forms during the processes of smelting have been and are being released and discharged into the atmosphere, and disseminated by the changing air currents over various and indeterminate areas of territory. About 7,000 tons of such ores are treated each day at the Washoe smelter.

Between February and September, 1903, the defendants remodeled the Washoe smelting plant. Before the remodeling, the sulphur and arsenic fumes had been carried out into the atmosphere by means of four chimneys, each of which was about 225 feet in height, and constructed on a level approximately with the smelting plant, but in the remodeled construction defendants built a large brick stack, and connected the same by means of flues with the smelting plant. Prior to 1902 there never was any complaint by farmers or property owners that there was any damage being done by the smelter fumes.

Between February, 1902, and February, 1903, when the construction of the new flues and stack was commenced, many of the farmers of the Deer Lodge valley complained that such quantities of sulphur and arsenic were discharged into the air through the several smoke stacks, with which the smelting plant was then being operated, that the crops and live stock in the valley were being poisoned and injuriously affected, to the great damage of the owners. Claims for damages on account of such poisoning, aggregating several hundreds of thousands of dollars, were presented by the farmers to the defendant Anaconda Copper Mining Company. The company's representatives investigated the matter and reported that damage was being done to the farmers, whereupon the defendant Anaconda Copper Mining Company made settlements and paid out to different persons sums amounting in all to more than $330,000. The company, intending as far as possible to prevent any further damage and any further claims for damage, had investigations made to determine methods and means by which the noxious substances emanating from the ores in smelting could be caught and retained from the gases and smoke, and that the remainder might be so scattered and disseminated as to cause no damage, if possible. As a result of such investigations, it was determined that the best way to accomplish the purpose was to construct large flues with dust chambers to collect the solid particles, so far as possible, from the smoke, and to erect a high stack upon an elevation at some distance from the smelting plant, in order that the fumes escaping into the atmosphere might be discharged at as high an elevation as possible, and thus become widely disseminated and diluted before coming in contact with any of the soil in the valley.

In order to carry out the results reached through the investigations, the use of the old smokestacks at the smelting plant was dis-

continued, and the defendant companies began to build a large stack, and to construct enormous flues to connect the stack with the various portions of the smelting plant wherein gases and other emanations were created in the operation of reducing the ores treated. In the execution of the plans, an elevated point was chosen as the site for the chimney, and a new chimney was put up, 300 feet above base, and at an elevation of about 1100 feet above the Deer Lodge valley proper. The diameter of the chimney at its base is 31 feet and 6 inches, and its diameter at the top 30 feet inside. The chimney is connected with the smelting plant proper by a double system of flues running from the base toward the smelting plant for a distance of about 1,000 feet. These double flues are connected with the chimney at opposite sides, at the base of the stack, and are constructed partially by excavating cuts in the hill, lining the same with brick, and by arched overhead construction, and are 60 feet in width and about 35 feet in height. At the end of the 1,000 feet of construction of double flues, and connected therewith, is a single flue, which is 60 feet in width, and 35 feet in height. The single flue is about 1,300 feet long, and at the end farthest from the stack is connected with separate flues and dust chambers, running to what are known as the "reverberatory," the "roaster building," the "blast furnaces," and the "converter plant," respectively; these being the several plants in which all the gases and emanations from the smelting operations are produced. Under the main flue and the double flues, tunnels have been excavated, through which cars run, and the flue dust catching capacity of these large flues remains practically unimpaired.

The respective plants in which the gases and fumes are generated are connected with this large flue by dust chambers and separate flues, which are of the following dimensions: A blast furnace chamber 250 feet long, by 40 feet in height, by 40 feet in width; a roaster dust chamber 290 feet long, 40 feet in height, by 40 feet in width; a converter dust chamber 260 feet long, by 40 feet in height, and 40 feet in width; a reverberatory dust chamber of the same dimensions as the blast furnace flue. All of the smoke and gases and other emanations from the smelting plant pass through these various dust chambers and flues up to the main stack, and go to the top of the stack, and thence into the atmosphere.

There is a dust catcher at the rear of the blast furnace building, the McDougall building, and the converter building; its purpose being to remove the dust from the smoke, the dust being removed for its valuable metal contents, and to prevent its going out to do damage to land.

The company also constructed an arsenic plant adjacent to the large flue, containing three furnaces, with a capacity of about 10 tons each, for treating arsenic, for the purpose of separating the arsenic, which collects and settles in the main part of the flue, from a portion of the flue dust before the flue dust is returned for treatment in the smelting plant. Arsenic is a by-product of the ores treated for commercial purposes. The portion of the dust which is high, about 90 per cent., in arsenic, goes to the arsenic plant, and as much as two tons a day is collected and sold for commercial purposes. The portion of dust not

treated for arsenic, approximately 160 tons daily, goes directly back to the reverberatory smelting furnaces in the form of flue dust, and is treated for the extraction of copper, silver, and gold. Some of the arsenic found in the ores treated in the blast furnaces and roasters goes out in slag, and part in volatile substances that is left in the smoke goes up the chimney and out into the air.

The only possible conclusion from the evidence is that, as a result of these briefly described improvements, the defendants built their plant in accordance with the best known methods and processes for accomplishing the purposes intended, and that the endeavor of the defendants has been, through these methods, to render the smoke, fumes, and emanations from the smelter harmless. Furthermore, as the case is submitted, the evidence discloses that the steps taken by the defendants are far greater and more extensive in character than those taken by any other copper smelter, and that the effect of the remodeling of the plant, and the use of the flues, dust chambers, and stack described, has been to prevent and to discontinue, proportionally to the ore treated, the discharge into the atmosphere of much of the dust containing the noxious substances complained of, which, before the improvements, had been discharged into the air from the smokestacks of the plant; and that a resulting effect has been that the fumes, and whatever dust the same contains, which was not removed therefrom, have been disseminated and scattered by air currents at a great height over a large area of country, thus rendering less harmful, in proportion to the ores treated, the smoke, fumes, and emanations from the plant, than was the case before the improvements were made.

Profs. Swain and Harkins, expert chemists, made some experiments by pitot tubes, introduced for ten hours into the big stack, 50 feet above the base, to ascertain the volume of smoke thrown out from the stack every 24 hours, and the milligrams of arsenious oxide contained in one cubic foot of the smoke. But Prof. Swain stated, in substance, that it was impossible to carry out the experiments as attempted by him, without introducing some errors, and that the slightest mistake in the chemical analyses in trying to arrive at the amount of arsenic would be multiplied by millions and millions. So much depended, too, in the experiments, not only upon accuracy in obtaining velocity and the ratio of volume of the sample taken to the total volume going out of the stack, but also upon the character of ore treated, and upon the temperature and other conditions at the very time of the experiments, that the court is not warranted in saying what was the exact volume of gas, and what its correct analysis is; and, as the case develops, it does not become of great importance.

At this point we may well turn to the evidence concerning complainant's relation to the case. He owns 320 acres of land about 5 miles easterly from the Washoe smelter. Before he acquired his farm, it had been occupied and cultivated by his predecessors in interest since about the year 1866 or 1867. The lands of complainant's farm are not of the best class of lands in the Deer Lodge valley. They are known as cold land, are in part low, and moist and partly contain alkali, are best fitted for raising wild and redtop hays, for stock grazing, and for dairy purposes, and are not very well adapted for crops of timothy or other

cultivated hay or grain. Moreover, the complainant has not taken good care of his premises, but has permitted them to run down, and has allowed a part of the land to remain without seeding, so that foxtail and other weeds have been allowed to grow, to the substantial depreciation of the value of the land.

Mr. Bliss acquired his farm in this way: About March, 1903, while he was in business in Butte, his health was not good, and he desired to leave the state of Montana. In making business arrangements, looking to that end, he accepted title to the farm in Deer Lodge county, in lieu of the sum of $8,000, to be applied upon the general transfer of his property. When he bought the farm, a contract of sale had been made between the predecessor in interest of the complainant, a man named Daniel James, and one John Smith, who was at that time in possession of the farm, and who had used it for pasture purposes, under and by virtue of which said contract the said Smith was to purchase the ranch at a stipulated sum. The complainant, Bliss, entered into an agreement with Smith, by which the terms and conditions of the contract of sale were changed so that Smith, instead of becoming a purchaser from James, was to become the purchaser from complainant, upon payment to the complainant of $5,000, and assuming the burden of a certain mortgage, which had theretofore been given by the predecessor in interest of the complainant, secured by the said premises, in the sum of $3,000. It was in this way that the valuation of $8,000 was put upon complainant's farm. The valuation, however, was a fair one in 1903, though since then the value has fallen to about $4,280. The investment in the farm was made by complainant under the belief that he would be able to sell it in accordance with the provisions of the contract of sale which had been entered into with respect to the property. It was not Mr. Bliss' intention to live upon the place. He never has lived upon it, and never has attempted to improve or cultivate or farm it, or to raise any live stock upon it. Moreover, he knew, when he bought, that the farmers in the Deer Lodge valley, including the occupant in possession of the farm, had made complaint against the defendant companies on account of the Washoe smelting and reduction works.

Reverting to the value of the Bliss land: Inasmuch as complainant, in 1904, rented the ranch to K. D. Smith for $750 and the making of some improvements worth about $200, the rental value that year was practically 12 per cent. of the then value of the land. Estimating 12 per cent. of the value as a fair rental, if it had not been damaged through any cause, complainant ought to have received $950 rental in 1905; whereas, the best offer he had in that year was $500 a year for two or three years' lease. This offer represented 12 per cent. of approximately $4,200, which sum is therefore a just estimate of the value of the place in 1905 and 1906 and 1907. From these figures it is shown that the depreciation in the value of the land was $3,800, and in rental value $450 per annum, or a total of $900 for 1905 and 1906.

It is very hard to reach a satisfactory conclusion as to the principal special causes for the depreciation in the value of complainant's land. Farmers who have known the land for 30 years differ radically, some ascribing the deterioration to poison of fodders by smelter fumes, and

167 F.—23

consequent danger to live stock and to crops, while others say that the value is reduced because in 1902, 1903, and 1904 the natural hay meadow was plowed and never seeded thereafter, that the land has been neglected, has much alkali, is injured by sunflowers, foxtail, and other weeds, and that there has been no injury at all to the pasture or to animal life thereon by the smelter smoke. The experts also disagree in most positive terms as to the condition of the fodder and the soil. But, after considering the evidence concerning some of the live stock that fed upon the pastures of the ranches in the immediate vicinity of the Bliss place, together with that bearing upon the condition of some of the animals that were upon the pasture in the Bliss ranch itself, my opinion concurs with the master's in finding that both of the causes ascribed, lack of proper farming and smelter fumes, existed and contributed more or less to the lessened value.

The fact is deducible, though, that the lesser injury was done by the smelter, and for these reasons: As heretofore stated, when Mr. Bliss bought his land, its principal value was for dairying purposes. It is entirely certain, too, that thereafter, in 1905, while he owned the place, the offer to rent that he received was made by a man who wanted it for a dairy. Now, if it were true that the cattle and horses of the dairyman who might rent would be exposed to poison in eating the grass in the pastures, and to the consequent sickness, falling off of milk production, loss of calves, and other effects of ingesting grass or hay that has been poisoned with arsenic, we naturally inquire why it was that Boone, who knew all the conditions that existed about the place in 1904, and whose good faith in offering to rent from Mr. Bliss was beyond question, wanted to rent the farm for dairy purposes and was willing to pay $500 a year rental for several years? The answer would seem to be a simple one, in the light of ordinary human experience. Common knowledge tells us that the last place a dairyman would seek would be a farm where cattle would be exposed daily to the peril of poison from arsenic in the pasture where they would feed; while, on the other hand, there would be nothing unusual in his taking a farm adapted for pasture and dairy purposes if the only objection was that it had been badly cultivated, or was unsuited for general agriculture. Thus we are irresistibly forced to the conviction that, as a fact, viewed from the standpoint of the experienced dairyman, the injury to Mr. Bliss' pasture from arsenic was not of the most serious character, and hence it follows that the larger depreciation must be attributed to some cause other than injury from poisoned fodders.

And, in support of this, there is further evidence of telling force. A dairyman, named Sweeney, of years of experience in Minnesota and Montana, who also knew the Bliss ranch well, rented part of it in 1905 from Mr. K. D. Smith, president of the farmers' association, and agent of Mr. Bliss. This dairyman testified that he had 68 head of cattle on the Bliss ranch, that they did well, that every milk cow had a calf, that the calves were the "finest" he had had since he had lived in the valley, that his 60 milk cows gave a general average of 2½ gallons of milk a day per cow, that the cattle ran in the pasture, that he had lived near the Bliss place since 1903, when the new stack was operated, and had not been injured in any way by smoke, and that he had made money

in his business until March, 1906, when he sold his cattle at $40 a head to another dairyman named Verlaine, who lived upon an adjoining ranch.

But, furthermore, Wolfe, a dairyman, who was called by the complainant, and who had rented the northern part of the Bliss ranch from Smith, agent, in 1906, admitted that his 24 cows on the Bliss place gave an average quantity of 2½ gallons of milk a day for each cow. He said that he took them up to the stables in the fall, that he fed them meal and some alfalfa which was raised upon a ranch only a mile away from the Bliss ranch, and that he had lost one calf which was sick when we went to the ranch, and one after he went there, and that two of his cows aborted after he went there. It is in evidence that the calf that died after he was on the place had white scours caused by feeding upon sour milk. Still further, another dairyman, named Blaine, who, like the others concerning whom mention has been made, was familiar with the conditions and locality, said: He went to the Bliss ranch in June, 1906; that Wolfe's cattle looked well, and that Wolfe wanted $60 a head for them; that he (Blaine) agreed to buy the cattle from Wolfe at $55 per head, and tried to rent the Bliss place for dairying, but that Mr. Smith, president of the farmers' association, ordered him off the ranch and prevented the consummation of his plans.

In the light of this evidence, how can the court find that there was very serious injury done to the fodders on the place by arsenic? Much less, too, can a conclusion be reached apportioning the damages.

No summary of the facts would be complete without reference to the attitude of many of the farmers of Deer Lodge county. Some time during the latter part of 1904, about 100 (approximately one-half) of the farmers and residents of that part of Deer Lodge valley called by complainant the "smoke zone," adjacent to the city of Anaconda, representing an ownership of over 50,000 acres of land, formed an association for the purpose of procuring evidence and prosecuting claims and suits against the defendants in this action, on account of the maintenance and operation of the Washoe smelter. Mr. K. D. Smith, who owned a ranch adjoining complainant's place, was elected president, and ever since 1904, has acted as the head of said association. Bliss, this complainant, is not and never has been a member of the said farmers' association, and appears to be the only nonresident owning farming lands in the so-called "smoke zone." Although he is the sole complainant herein, the suit has been prosecuted mainly for the benefit of the members of the farmers' association. It appears that, before the present suit was instituted, the farmers, seeking settlement for damage claims, wrote to the representatives of the defendant Anaconda Copper Mining Company. The company, through its agent, replied, asking the farmers' association to specify, by bill of particulars, the damages claimed by each and every farmer who felt that his property had been injured by the smelter fumes. To this letter the farmers' association replied at length, demanding cash purchase of their lands before May 1, 1905, in the following language (italics mine):

"Anaconda, Montana, March 4, 1905.

"Anaconda Copper Mining Company, Anaconda, Montana—Gentlemen: The Deer Lodge Valley Farmers' Association, consisting of 107 members, repre-

senting over ninety per cent. of the lands and property of the Deer Lodge valley, comprising practically all of Deer Lodge county and the southerly portion of Powell county, did on February 21, 1905, call a meeting of said association to be held at the Willow Glen schoolhouse, in Deer Lodge county, at which nearly all the members of the said association were present. The undersigned committee, consisting of nine members, were duly elected by said meeting for the purpose of receiving all claims for damages resulting from the operation of your smelting plant, known as the Washoe smelter.

"*At said meeting it was understood by all the members of said association that they would present their claims for the lowest cash settlement which they would be willing to consider by way of compromise for all of said damages*, and that said committee should be empowered to exclude any unjust claim or claims for damages, as well as reduce the amount of any claims which would be considered too high after an investigation by said committee. * * *

"The claims which the committee approved are presented for settlement after a very careful investigation, and as the committee was selected from all portions of the valley, the committee were in a position to pass on most of these claims from personal knowledge of the property of the claimants. In fixing the damage, if any part or portion appeared unjust or was in doubt, the committee eliminated that part or portion of such claim. *It would therefore follow that the committee would not care to consider any counter proposition from your company on approved claims.*

"*As to the claims which are presented without recommendation, if your company does not see its way clear to adjust them on the basis on which they are presented, you are at liberty to enter into personal negotiations with these claimants.* These personal negotiations, however, and the delay arising therefrom, shall not in any manner interfere with the association from filing suits in equity and bringing actions at law for damages, it being the sense of the association, as expressed through the committee, that unless an early settlement can be reached, that suits in equity will be filed and actions at law will be commenced, which would not prevent a settlement, unless the company should consider such action on the part of the farmers to be a withdrawal of the offer of compromise. No suits of any character will be filed before the 7th day of April, 1905, but from that date it will be optional with the *members of the association to institute legal proceedings unless the company has signified, through its proper officers, acceptance of the settlements proposed.*

"Claims have been presented for damages aggregating $2,300,000.00, as the damages actually sustained by members of this association. *These claims have been reduced to about $1,750,000.00, and for this amount the committee has instructed suit to be brought in the individual names of the parties, unless a settlement is reached.*

"The cause of this reduction has been owing to the fact that the company settled with most of the farmers two years ago for personal damages; that claims for damages to crops and personal property have been eliminated except for the past two years, excepting in three instances, which are N. J. Bielenberg, Quinlan Bros., and Austin De Rosier. These claims have been included for a greater period than two years for the reason that no settlement was reached between these parties and the company two years ago. The farmers, however, contend, after having been advised by counsel, that five years is the statutory period in which action for damages of this character can be maintained. Whether or not the company will accept this contention will be immaterial, for the reason that all claims except the three mentioned have been restricted to the two-year period.

"All unjust, inequitable and slight claims for damages have been rejected. This also accounts for the difference between $2,300,000.00 and $1,750,000.00.

"*When the farmers were called upon to place the lowest cash valuation of the damages which they had sustained, they presented to your committee damages aggregating $1,536,876.00. Your committee, after careful and thorough investigation, reduced these claims to $1,120,731.00 approved claims, and $127,979.50 claims to be submitted without recommendation. It is understood and agreed that if the company makes settlement of these claims as presented,*

*this includes title to all of this property, including land. water rights and improvements, and that the farmers will surrender possession of these properties not later than November 1, 1905, provided settlements are made and money paid on or before May 1, 1905.*

"The real property damage included in this settlement consists of 60,525 acres of patented lands, together with all water rights and improvements, all being under fence, and generally all improved farms, for which is demanded the sum of $918,147.00, which insures the company title to all of these lands, water rights and improvements for the sum of $18.17 per acre. The committee also suggests that if a settlement can be reached, that the company shall be allowed in every instance to withhold whatever amount of money may be necessary to perfect title or remove liens or encumbrances. *That in a few instances, some of the farmers have indicated that if the company would deed back the land and improvements, they would be willing to allow a certain stated amount by way of reduction in the amount presented, if allowed to keep the property.*

"Almost all of the claims for personal property damaged were rejected, as nearly all the stock were settled for two years ago, and the committee refused to allow any damages except on new stock which has been brought into the Deer Lodge valley since the settlement. In place of any new stock having been brought in, nearly all of the stock has been removed from the valley, owing to the general sickness and death of the stock.

"*The committee also desires that no settlement be made with the individual members of the association, and that in the event of a settlement, that the same be made through the Daly Bank & Trust Company, of Anaconda, Montana, through the committee of farmers, as certain advances, attorney fees and expenses have been incurred which it would be impracticable to collect if individual settlements were made in the absence of any member or members of the committee.* * * *

"The farmers are anxious to have an early disposition of the matter on the part of the company, as they will attempt to protect the coming crop provided settlements cannot be made.

"The committee, by way of explanation, desires to call the attention of the company to the fact that the farmers have not presented their claims for damages since the settlement two years ago up to the present time, for the reason that when said settlement was made, the company promised, and the farmers believed, that the construction of a large stack would prevent further injury and the farmers decided to wait until they became fully satisfied as to what would be the result of the operation of the smelter after the construction of a large stack. It has now become apparent to the farmers of Deer Lodge valley that stock raising and farming cannot exist there so long as the smelter is being operated on its present large extensive scale, and treating the class and character of ores which are produced by the mines of Butte. The farmers also feel that having settled in the valley long prior to the smelting plant, they perhaps have prior rights which the smelting interests are bound to respect, and which should be taken into careful consideration by your company in attempting to reach an amicable settlement.

"The members of the association and the committee have kept constantly in view the fact that the company, in operating its smelter, has at all times used the latest and most improved methods for smelting, and that the damages which have arisen have been the natural and usual result of the smelting operations; that the company two years ago made prompt settlement of the damages which had been occasioned by the operation of the smelter; that the company immediately thereafter spent a large sum of money in good faith in attempting to avoid further damages to the farmers of Deer Lodge valley. The farmers have at all times been anxious to remain on good terms with the smelting interests, fully realizing the importance of the mining industry to the state of Montana, and that mining cannot be conducted without smelting and the conducting of smelting plants and that there is not a single farmer who is a member of this association who is desirous of in any manner interfering with the operations by the company of its mining properties or its smelting plant, until it becomes apparent that the company intends to con-

tinue its smelting operations without regard of the total destruction of the stock raising and farming interests of the Deer Lodge valley.

"Acting in view of these important considerations, the committee has felt that the farmers should stand at least one-third of the entire loss accruing to them by reason of the operation of your smelting plant, in order that an amicable settlement between the farming interests and the smelting interests may be reached. It has therefore been the effort of the committee in adjusting these claims to present them at approximately two-thirds of the damages sustained, and not to approve a claim where the individuals would not submit to the one-third reduction. * * * "

This letter was signed by nine persons, as members of a committee of the farmers' association.

The defendants seem to have made no reply to this demand, and, as said, this suit was instituted on May 4, 1905. It does not appear that any action at law has ever been filed by complainant, or that any judgments for damages have been obtained by any members of the farmers' association, though two or three suits are pending for damages claimed to have been done before the new stack was built. It is a circumstance that, although no member of the farmers' association is a party to this suit, yet the association has been directly responsible for the presentation of the evidence, and, through assessments levied upon its different members, has raised funds through a committee. Bliss, the complainant, prior to bringing this suit, put his farm in the hands of Mr. Smith, president of the farmer's association, for rental purposes, appears to have paid little attention to the matter, and has not contributed any portion of the expenses of conducting the same, except the rent of his ranch, which was turned over to his counsel. He has really given control to the farmers' association, in the interest of prosecuting this suit, and has allowed his name to be used to try a "test case," admitting that he is the person through whom the other farmers are trying to establish their contentions. Mr. Bliss himself refused to consider an offer of purchase made to him in June, 1906, by an agent of the defendants having given as a reason for such action the pendency of this suit, and that he had yielded management of his place to Mr. K. D. Smith and to Mr. Clinton, who was counsel for the farmers' association.

Now, inasmuch as we have ascertained that some damage, the amount of which is not susceptible of correct ascertainment from the evidence, has been done to complainant's farm by the operation of the Washoe smelter, attention is next appropriately addressed to what, if any, abnormal conditions existed in the Deer Lodge valley before the evidence in the present suit was submitted, which are due to acts of these defendants. It is established that there was more or less spotting on the vegetation, caused by the smoke from the stack. The spotting is explained by one of the expert botanists as due to the dropping of substances in the smoke stream on the vegetation, which kill the immediate section they fall upon. Technical botanists disagree radically as to the extent of the area so spotted; some, called by defendants, confining it to within 5 miles of the stack, while those called by complainant say it was observable as far away as 13 miles northwesterly. By the botanical evidence, including the exhibits, it is made

apparent how very difficult it is to distinguish between the spotting of vegetation by sulphur and certain other injuries, for instance, alkali, sun scald, insect, hail, or fungus growths. To one unskilled in technical plant life, the only way to resolve the divergent views of the scientists is to form an opinion of the existing conditions, as they actually appeared to intelligent, practical farmers and dairymen, and as practical agricultural results may reflect upon the matter, and then to consider and correlate the scientific evidence to such conditions. This I have done with great care, and my best judgment is that there has been no substantial injury done to Mr. Bliss' land, or to the crops thereon, by the sulphur discharged into the atmosphere since the big stack was built, and that there has been no general, substantial, harmful effect from the smoke upon the quantity of the crops produced upon the Bliss or other lands, and that no permanent injury has been done to complainant's or other lands in the valley. There was evidence showing past injuries to coniferous timber on the hills back of the smelter, and it was made quite clear that damage is now being done in the hills right back of the smelter along Mill creek, where the smoke spreads through a draw, the bottom of which approaches the level of the top of the chimney; but, apart from this special damage in this immediate vicinity, the weight of the evidence is to the effect that the principal damage to timber was done before the new stack was operated—some by the fumes, and some, which is attributed to smoke, was done by fires at different times in years gone by.

Let us now briefly inquire into the conditions of animal life upon the farms within a few miles of the smelter. After the Washoe smelter commenced to operate, many horses, that were in pastures in the valley, suffered from sore noses. Sore noses were observed in some horses on the Bliss ranch. Stated in ordinary language, the sore nose ailment consists of a sort of ulcer, from one to three inches in length, on the septum in the direction of the upper lip, and appears as if it were produced by a burn, or an irritating medicinal blister, or acid; the ulcer often containing a large piece of dead skin tissue, in a few instances involving the lining membrane of the nose, and penetrating the partition between the nostrils. The horses affected, generally speaking, also had garlicky breaths, rough coats, and suffered from diarrhœa; some were thin, some were quite easily exhausted, and many appeared to be unthrifty. The ulcers would heal with ordinary stable care, and the animals would nearly always recover if taken away from the valley pastures. Numbers of horses so affected were killed for examination, and post mortem investigations disclosed lesions affecting the stomach, intestines, liver, kidneys, spleen, heart, respiratory organs, and membranes of the brain. Chemical analyses of certain animal tissues were also made by experts, and more or less arsenic trioxide found. Many cattle were affected. None of the cattle had sore noses; witnesses saying that this was because cat-, tle can clean their nostrils with their tongues, while horses cannot. Some of the symptoms manifested in cattle were garlicky breaths, rough coats, coughs, tucked up bellies, scouring, and drooling. Eliminating the sore nose, the lesions found in the cattle examined after

death were generally similar to those found in the horses. In one of a number of steers that had been kept by defendants for experimental purposes upon the Bliss pastures, which was killed for examination by Dr. Formad, of the government service, there were found vascular changes, epithelial changes, and connective tissue changes, which were evidently caused by an irritant poison.

By again reasoning from facts seen and testified to by plain witnesses, and weighing what things were so actually seen with what experts have said, and with what experiments have been made, out of the mass of evidence, I must conclude that the lesions observed were caused by the irritant or corrosive poison arsenic. This arsenic was deposited, to a greater or lesser extent, upon the fodders of the pastures, and when ingested by live stock caused ailment and sickness. The most rational view is: That the volume of the smoke stream, with its arsenic contents, is at times carried by air currents upon the lands adjacent to the smelter; that sometimes the volume is much more dense than at other times, depending upon atmospheric conditions, but that when the smoke is dense and low there is a precipitation of more or less arsenic upon the fields; and that a sufficient quantity is precipitated to poison the pastures, and that animals feeding thereon are poisoned. Naturally, owing to variable winds, there is no rule of distribution of the smoke, so that there is no uniform extent of the results of the smoke upon animal life. Hundreds of animals which grazed in the vicinity near to the smelter have never shown the slightest symptoms of poison. Cows in the city of Anaconda have thrived in the highest degree. Perhaps but a few animals out of a large number grazing in the same field have been affected at all. Yet, after all, when the facts, as well as expert opinions, are assembled and harmonized, the strength of the whole proof is such that it practically excludes any general cause for animal unthriftiness other than arsenical poisoning.

But, while the conclusion just reached is the only accurate one under the evidence, still it must not be taken that it has been arrived at without overruling a strong challenge to every single issue pertaining to live stock conditions To some of these matters it is proper to advert briefly. For instance, it is not to be inferred that the complainant has sustained his contention that the sickness in animals has been fatal, or that it has been so general through the Deer Lodge valley as to make the raising of live stock either impossible or unprofitable in all parts thereof. Complainant called as witnesses less than half of the farmers in the farmers' association; whereas. defendants introduced the testimony of a number of farmers, not members of the association, who have lived for years in the vicinity of the smelter, within the so-called "smoke zone," and who said that they had had no trouble with their stock or crops since 1903, and that their ranches were profitable. Nor can it be doubted that upon the cross-examination of many of complainant's witnesses it was developed that there has been not a little confusion between live stock conditions which existed prior to 1903, and those that have existed since. These dates are most material, because, without doubt, great damage was done by the smoke

before 1903 (partly to remove the cause of which the smelter was remodeled, and the high stack built), and because the gist of the present suit is to close the smelter to prevent future damage reasonably certain to continue.

It would appear, too, as showing that the sickness is not fatal, that, notwithstanding the somewhat abnormal condition of animal life that has existed since 1903, the percentage of death rate among live stock through the valley in 1906 was normal, in that, out of about 9,384 head of cattle and 1,632 horses accounted for, the total loss was 54 cattle and 38 horses. Animals seem to sicken slowly, and often fail to show their true condition without careful examination. As apposite to this statement, the student of animal diseases and of pathology and toxicology will be especially interested in reading of the elaborate experiments made by the experts in the case, and will be enlightened by the precision of learning displayed in their testimony; but it is the whole evidence, lay and expert, practical and theoretical, that has led to the finding of arsenical poisoning, as heretofore ascertained.

A fair conclusion of fact is that there has been exaggeration by some of complainant's witnesses of conditions since 1903, and, as already indicated, much carelessness of statement in defining injury done before and since the new stack was put into use. It is to be remarked, too, that the evidence tends to show an improvement in animal conditions in 1906 over 1905, but exactly why this is so does not appear. It may be that there is less stock near to the smelter, and that the animals that were poisoned in 1903, before the new stack was built, continued to be ill through 1904 and 1905, and then recovered, or it may be that, in 1906, defendants, by the construction of another arsenic furnace, or otherwise, took additional measures to eliminate arsenic from the flue dust at the smelter. No satisfactory reason can be gathered, and the mere fact that there was a betterment is left standing, not to be overlooked, though, among the things that aid in final solution.

Fortunately, I have been helped to a better understanding of much of the testimony in the record—indeed, of the whole case—by a visit of two days to the valley, during which time I rode many miles in an automobile in various directions from the smelter. The trip was made in August, 1905, in company with the master in chancery, counsel for complainant, and defendants herein, and one or more expert witnesses for the respective litigants. As I had asked the several counsel to call my attention to anything they thought worthy of particular notice, it is fair to say that I had an excellent opportunity to gain a general, though, of course, somewhat superficial, insight into conditions. Upon the first day, which was bright, the smoke from the big stack rose high into the air, and seemed to be carried far away, so high that its diffusion would seem to have been too general to do injury to any land; but, on the second day, the weather was rainy, and the clouds were lower. The smoke then was more dense, and its stream was carried down toward the Bliss ranch and southerly, and northerly for a few miles toward the center of the floor of the valley, and was there dissipated. The trip impressed one main thing very firmly upon me that neither the eye nor the training of an experienced or scientific agriculturalist was required to ascertain. It was that the allegation of com-

plainant's bill, to the effect that the Deer Lodge valley, and the country adjacent to the smelter, is barren and desert like, is grossly inaccurate. It is true that the land and vegetation lying within, say, a quarter of a mile of the smelter, is visibly affected; but, outside of this limited area, there was the appearance of healthy natural conditions, of successful cultivation, and of such crop growths as are usually seen in the valleys of the state. The harvest was going on. We saw hundreds of healthy looking shade and fruit trees about farm houses, while the grain fields and pastures looked as others in Montana generally do during or just after harvest. We walked over a portion of complainant's place, noticed the foxtail and inferior quality of the grasses growing, and, except for the smoke on the second day, there was nothing in the physical appearance of the complainant's farm or of the valley that indicated unusual or abnormal conditions. Prof. Jones, of Utah, one of the botanical experts representing complainant, showed me some spots on vegetation just beside the smelter, and in gardens upon ranches, and also upon some leaves of trees growing on a ranch about 10 miles away, which he said were due to smoke. I saw spots also upon apples on the trees at another ranch, but there is evidence tending to show that the marks on the fruit were due to hail. We saw cattle and horses in the fields, and particularly noticed a number of fine looking cows within the pasture on complainant's place. My attention was also called to several horses that had been driven into a corral at the Staffanson ranch for me to see. One or two had sore noses, and one or more seemed sick and paralyzed; but just when these animals became sick is uncertain, for a witness called by the defendants testified concerning them as follows:

"Q. Did you see some horses that were exhibited to Judge Hunt that had sore noses on that trip? A. I saw a bunch of horses in Mr. Staffanson's corral that they had picked especially, I think, for Judge Hunt's benefit, that they showed there, and I saw Dr. Cheney point out a black horse that we paid Hi Staffanson the full price for as a horse being 'smoked,' when Judge Hunt was with us. Q. When had the companies paid for that horse? A. They paid for it some time in 1903, paid Staffanson. * * * Q. Was this collection of prize horses the derelicts that had been left over from 1902 and 1903? A. I know some of them were. There was a brown mare from Tom Boland's that we paid Duncan for. That was one of the left-over horses. And several there from Mr. Staffanson, I could not name them, that had been settled for. They had evidently picked every poor horse in the country that they could get, and brought to that corral. They did not show any good ones, though there were some in the stable."

I also saw a small band of cattle that were at a corral in another part of the valley. A few of them looked unthrifty and as if they had not shed their winter coats.

The purely equitable defenses next demand attention. To particularize some facts: When the site of the old works was chosen, the land now occupied by the city of Anaconda was vacant and unoccupied, but at the time of the commencement of the construction, and the employment of many persons in the construction work, a community was established, and in time the city of Anaconda grew until it now has a population of about 12,000. This city owes its growth and prosperity to the conduct of the smelting business at the Washoe smelter, and its population is dependent for subsistence, directly or indirectly, upon the

continued operation of the smelter. It is a well-built city, where many people have made homes for themselves, has a superior class of business buildings, and had an assessed valuation in 1906 of $3,300,000. The people living there have made their investments, believing that the smelting works would continue to operate, and, as would be natural, the products of the Deer Lodge valley—hay, vegetables, garden truck, grain, alfalfa, live stock, and other farm products—have generally found ready market at good prices in Anaconda. In 1905, though, there were some complaints made against Deer Lodge valley hay, and sales were not as ready as they would have been had buyers not believed the hay was "smoked"; but in 1906 there was quick sale for it all at current market prices.

It is proven that, even if the defendants could find a more suitable location for the smelter, in order to avail themselves of it a new railroad track system would have to be built to convey the ores from the mines at Butte, and in the construction of new works, which would take five years to build, the salvage from the present plant would not be worth more than $1,000,000. Furthermore, the natural advantages for a smelting plant, on account of the favorable grades from the mines at Butte to the Washoe smelter, and on account of the water and lime rock, and other facilities necessary in the economical and profitable operation of a smelting plant, could not be found elsewhere, and, as a result, transportation cost would be increased, and mining of a very large percentage of the ores now treated at the Washoe smelter could not be successfully carried on. No known site exists in Montana where the operations of the Washoe smelter can be carried on with less damage and inconvenience to surrounding property and inhabitants than the present site.

As further evidence of the importance of the defendant's works to the communities of the state, it is proven: That the total assessed valuation of the property in Deer Lodge county, within which Anaconda is situated, in 1904, was $8,120,826; that of such amount $4,058,573 was assessed against the property of the defendants; that from 1902 to 1906 the defendants have paid more than 51 per cent. of the total taxes of the county; and that if an injunction were to be issued, as prayed for, the property of the defendants would be practically valueless, and necessarily there would be such a reduction in the assessable property within the county as to make it impracticable to continue the county organization of Deer Lodge county. To show the great harm that would be done by the closing of the smelter, it is established that Butte, with a present population of over 70,000, has grown within the last 30 years from a mining camp, because of the development of the copper mines, many of which belong to and are operated by the defendants herein. Practically the whole population of Butte depends upon the continued operation of the copper mines, and about two-thirds of all of the ores mined at Butte are treated and reduced at the Washoe smelter. The effect of stopping the works at Anaconda would be to deprive Silver Bow county, wherein Butte is situated, of at least 30 per cent. of the total taxes collected, and, as a consequence, there would be a great depreciation in the value of all property in that county, which is now subject to assessment, and that, because

of the revenues paid to the state by the counties of Silver Bow and Deer Lodge, the income of the state would be materially affected.

It is in evidence, also: That the defendants use vast quantities of coal, coke, and lumber, which are supplied from points within Montana, other than Butte and Anaconda, and that in supplying them employment to a large percentage of the population is furnished; that during 1906 there were 4,548 men employed in the mines which furnished ore to the Washoe smelter; that in the same year there were about 2,500 men employed in the reduction works; that the railroads operating within Montana derive their earnings largely from the freight handled in connection with the operations of the defendant companies; that, in the first six months of 1906, the defendant companies paid to the men employed directly by them, including the money paid out by the companies which ship ores for treatment to the Washoe smelter, over $5,000,000; that the railroad freight paid during the first six months of 1906 exceeded $1,400,000; and that the defendant companies paid out for material, largely furnished from different points within Montana, and elsewhere, yearly amounts of about $4,000,000.

As further evidence of the magnitude of the interests involved, it appears: That the defendants' works, since 1902, have expended over $7,000,000 in labor, over $4,000,000 for coal, over $4,000,000 for coke, over $740,000 for lime rock, over $1,300,000 for machinery, and over $53,000 for lumber; that up to June 30, 1906, the ores treated at the Washoe smelter yielded over 590,000,000 pounds of copper, over 25,000,000 ounces of silver, and over 164,000 ounces of gold; and that annually from 17 to 20 per cent. of the supply of copper in the United States has been produced by the Washoe smelter.

It now remains for me to apply to all these facts as stated principles of real justice. Speaking precisely, there is but one record party complainant, and two defendants, whose rights can legally be adjudicated by any decree herein. As a single complainant, Mr. Bliss is not suing on behalf of himself and others similarly situated, but relies upon a right to injunction as a consequence of his proof of public nuisance, and of the showing that it has been of special injury to himself. The evidence of the effects of the smelter smoke upon others besides Mr. Bliss is relevant, but its purpose is to show that the smelter interferes with the comfortable enjoyment of property of an entire neighborhood; while the evidence of the individual damage that Bliss has sustained, and is still sustaining, and will sustain, is material in fixing his status as a private party who can maintain the bill. In this sense he can be said to act in behalf of others who may be injured. Mississippi & Missouri R. R. Co. v. Ward, 2 Black, 492, 17 L. Ed. 311. The case, however, has in fact so obvious a bearing upon the interests of many others who live in the Deer Lodge valley near to the Washoe smelter that complainant was expressing the general situation when he testified that he had become the instrument through which a test case is being tried between the farmers and the smelting company.

There is this feature in the concrete case: Bliss will not be driven from his home if the operation of the smelter is not enjoined, for he never has made his home on his land, and never intends to—that is

to say, there is no sentimental concern involved; there is not and will not be personal inconvenience or physical discomfort, or even annoyance, to him or his family, on account of the smelter fumes. To him the special damage which he has suffered or will suffer is an absolute pecuniary matter. Of such as he has suffered in the past there could be exact ascertainment, and, for recovery thereof, there appears to be no reason why he cannot bring his action at law with trial before a jury and obtain a verdict and judgment. He says however, it is unjust that, as an injured party, he should be compelled to try actions at law to recover for his special injuries, because they will be repeated for an indefinite period, or are continuous in character. In fact, he goes farther and insists with earnestness that to prevent future injury his only effective remedy is by resort to a court of equity, and that there is no alternative to injunction which will forbid defendants from operating the Washoe smelter. Although he alleged in his amended bill that he could show that the poisonous substances emitted from the smelter could be precipitated and impounded at the smelter with very little extra cost to the defendants, he offered no proof, whatsoever, to support the allegation, but chose to put himself on the ground that injunction must issue, which will stop the works and prevent the treatment of the only ores that defendants now smelt. Thus we are confronted directly with the underlying question whether injunction must issue without regard to all the circumstances existing in the particular case.

I need not dwell on the question of power, for it is too well established that, from an ancient date, with regard to nuisance, courts of equity have jurisdiction, based upon the reasonable certainty of irreparable mischief, that sort of material injury by one to the comfort of another, which requires the application of a power to prevent, as well as to remedy, the evil (Jeremy's Equity Jurisdiction, § 310; Daniell's Chancery Pleading & Practice [6th Ed.] § 1636), but will pass to the point of close bearing upon the original question, that of discretion where injury of the character proved in this case is threatened to be continued.

In my opinion, where there is presented a conflict of rights, it is the duty of a court of equity, in protecting those of the complainant, to consider those of the defendant, and in doing so it may consider also the injuries that may result to others by issuing the writ of injunction. Put broadly, then, the proposition is this: The writ of injunction is not ex debito justitiæ for any injury threatened or done to land or rights of a person; but the granting of it must always rest in sound discretion, governed by the nature of the case. To sustain this rule I need refer to but a few cases.

In Parker v. Winnipiseogee Lake Cotton & Woolen Company, 67 U. S. 545, 17 L. Ed. 333, the Supreme Court held that, although the right of a complainant has been established at law, a court of chancery will not "as of course" interpose by injunction, but will consider all the circumstances, the consequences of such action, and the real equity of the case. A comparison of injury with the damage which would result by injunction was made by the court in Atchison v. Peter-

son, 87 U. S. 507, 22 L. Ed. 414. The Supreme Court there held that injury sustained by accumulation of sand in water used for mining by one of the parties to the litigation was hardly appreciable in comparison with the damage which would result to the other parties from an indefinite suspension of work on their valuable mining claims, and that it was right for the court not to interfere by injunction to restrain their operations, and to leave plaintiffs to their remedy at law. And again, in Osborne v. Missouri Pacific Railway Co., 147 U. S. 248, 13 Sup. Ct. 299, 37 L. Ed. 155, the court recognized a distinction between the instance of an actual invasion of private rights which might be assumed to be essentially irremediable, and one where there is no direct physical taking of the estate itself, in whole or in part, but the infliction of damage in respect to the complete enjoyment of the estate, and implied that probably injunctive relief would be awarded ex debito justitiæ in the one case, while the court would decline to interfere in the other. And again, in the Debs Case, 158 U. S. 564, 19 Sup. Ct. 900, 39 L. Ed. 1092, the court refers to the frequency of suits where the necessity for the exercise of equity jurisdiction of public nuisance has depended upon the circumstances of the particular case, and, speaking through Justice Brewer, remarks:

"Of course, circumstances may exist in one case, which do not in another, to induce the court to interfere or refuse to interfere by injunction, but the jurisdiction, the power to interfere, exists in all cases of nuisance."

In New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820, the Supreme Court held that there was no absolute right to an injunction; and they so held in Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956, notwithstanding the finding that "perceptible injury" was done by diminution of streams in Colorado to portions of the lands belonging to the state of Kansas. "It cannot be denied," said the court, "in view of all the testimony, that the diminution of the flow of water in the river by the irrigation of Colorado has worked some detriment to the southwestern part of Kansas, and yet when we compare the amount of this detriment with the great benefit which has obviously resulted to the counties in Colorado, it would seem that equality of right and equity between the two states forbids any interference with the present withdrawal of water in Colorado for purposes of irrigation."

A like general rule was clearly recognized in the case of Georgia v. Tennessee Copper Company, 206 U. S. 230, 27 Sup. Ct. 618, 51 L. Ed. 1038. Indeed, the court there prefaces its observations as to the peculiarities that mark a suit where a state in its capacity of quasi sovereignty sues for injunction against citizens of another state, and says that, if the state has a case at all, it is somewhat more certainly entitled to specific relief than a private party might be, and thereafter observes:

"This court has not quite the same freedom to balance the harm that will be done by an injunction against that of which the plaintiff complains, that it would have in deciding between two subjects of a single political power. Without excluding the considerations that equity always takes into account. we cannot give the weight that was given them in argument to a comparison between the damage threatened to the plaintiff and the calamity of a possible stop to the defendants' business, the question of health, the character of the forests as a first or a second growth, the commercial possibility or im-

possibility of reducing the fumes to sulphuric acid, the special adaptation of the business to the place."

Comparison of injury was held proper, too, in Dun v. Lumbermen's Credit Ass'n, 209 U. S. 20, 28 Sup. Ct. 335, 52 L. Ed. 663.

Additional authority, directly pertinent, is found in Mountain Copper Company v. United States, 142 Fed. 625, 73 C. C. A. 621, where the Court of Appeals of the Ninth Circuit decided that an injunction would or would not be issued as the exercise of sound discretion warranted, guided always by certain established rules which meant a consideration of all the circumstances of each case. And in the very recent case of McCarthy v. Bunker Hill & Sullivan Mining & C. Co. (C. C. A.) 164 Fed. 927, decided since the Supreme Court decisions in Kansas v. Colorado and Georgia v. Tennessee Copper Company, supra, after a very careful investigation and consideration of the importance of the principle involved, the Court of Appeals for this, the Ninth, circuit, reaffirmed the rule established in Mountain Copper Company v. United States, supra; Judge Ross saying:

"To an injunction, however, even on final hearing, no one has an absolute and unqualified right. Such an application appeals to the conscience of the chancellor, to the exercise of a wise and sound discretion, and should be granted or withheld according to the equities of the case as made to appear by the record. Each case must be considered and made to depend upon its own particular facts and circumstances, in the consideration and determination of which the general rules governing courts of equity are to be borne in mind and applied. * * * Nor should an injunction be granted in any case where it will necessarily operate contrary to the real justice of the case. Furthermore, where, as in the present case, it is sought to enjoin a lawful business, the court should give due consideration to the comparative injury which will result from the granting or refusal of the injunction sought."

Among the leading cases quite like that at bar, which sustain the proposition as heretofore laid down, is Madison v. Copper Company, 113 Tenn. 335, 83 S. W. 658; while, of these which are relied upon as holding to a different doctrine, American Smelting & Refining Co. v. Godfrey (C. C. A.) 158 Fed. 225, is undoubtedly the most important. The facts in that case made a much stronger showing for injunction than in this. There, 409 farmers, who lived upon their lands as their homes, joined in the bill as complainants, asking injunction against certain copper smelting companies in Salt Lake county, Utah. The fact was that the operation of the smelters resulted in very great damage to, if not the total destruction of, complainants' property, and the fumes were impairing or injuring the health of those living upon their farms. Under such conditions the rule which permits a balancing of injuries and benefits, or of comparative convenience or inconvenience, was held to be of no avail to defendants, and hence injunction in a modified form issued. The case may therefore, on its facts, be distinguished from the one under investigation; but if the learned court intended to lay down as a principle that, when there has been any invasion of right, by one in the conduct of a business lawful in itself, there can be no consideration of comparative losses and benefits, and of circumstances of consequence to defendant and to others in issuing the writ of injunction, then the decision is not in harmony with the cases of Mountain Copper Co. v. United States, supra, and

McCarthy v. Bunker Hill & Sullivan Mining & C. Co., supra, decided by the Court of Appeals of this, the Ninth, circuit. But the decision in the Utah case must be taken with its special facts. I repeat, too, that the rule of the McCarthy Case, supra, was established after the decisions of the Supreme Court in Kansas v. Colorado, supra, and Georgia v. Tennessee Copper Company, supra, to neither of which cases does the opinion in American Smelting & Refining Company v. Godfrey, supra, refer. Believing, then, as I do, that the doctrine of the McCarthy Case, supra, accords with the principles of equity, as expounded by the Supreme Court in its most recent expressions, it becomes authority for this court. A clearly announced reason for the general rule is Story's statement:

"Courts of equity constantly decline to lay down any rule which shall limit their power and discretion as to the particular cases in which such injunctions shall be granted or withheld. And there is wisdom in this course, for it is impossible to foresee all the exigencies of society which may require their aid and assistance to protect rights or redress wrongs. The jurisdiction of these courts thus operating by way of special injunction is manifestly indispensable for the purposes of social justice in a great variety of cases, and therefore should be fostered and upheld by a steady confidence. At the same time, it must be admitted that the exercise of it is attended with no small danger, both from its summary nature and its liability to abuse. It ought therefore to be guarded with extreme caution and applied only in very clear cases; otherwise, instead of becoming an instrument to promote the public as well as private welfare, it may become a means of extensive and perhaps of irreparable injustice." Story's Equity Jurisprudence, § 959b.

The discussion next easily leads me to inquire how this judicial discretion should be used. No one would contend, for instance, that a discretion would be well exercised which would withhold injunction at the request of one injured, against one conducting a business in itself unlawful, no matter how vast were his interests, or what the consequences might be; nor would the exercise of a discretion be sanctioned which would refuse to abate a nuisance solely because the business, out of which the nuisance has arisen, is lawful and extensive, while the right of the person wronged is insignificant, or his estate humble, for this would be abuse. And the writ would be equally unwisely issued on the petition of one who, no matter how weak he might be, has sought it to extort his own terms, from an individual or corporation, by way of damages to his property; or, stated more comprehensively, in its scope the principle is that the courts should not issue the writ in any case where its operation is really oppressive and destructive of a lawful occupation, and where its issuance would work vastly more harm to a defendant and many others than it would benefit the complainant. Judge Cooley, in Edwards v. Allouez Mining Co., 38 Mich. 46, 31 Am. Rep. 301, said:

"An injunction is not a process to be lightly ordered in any case. Where the effect will be to present to the owners of a valuable mill the alternative either to purchase complainant's lands at his own price or to sacrifice their property, any court having the power to order it ought very carefully to scrutinize the case and make sure that equity requires it. In theory its purpose is to prevent irreparable mischief; it stays an evil, the consequences of which could not adequately be compensated if it were suffered to go on. * * * 'There is no power,' says Mr. Justice Baldwin, 'the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or is more dangerous in a doubtful case, than the issuing of an in-

junction. It is the strong arm of equity, that never ought to be extended unless to cases of great injury where courts of law cannot afford an adequate or commensurate remedy in damages.' Bonaparte v. Camden, etc., R. R. Co., Baldw. 218, Fed. Cas. No. 1,617. All the cases referred to show that the court looks beyond the actual injury to contemplate the consequences, and, however palpable may be the wrong, it will still balance the inconveniences of awarding or denying the writ, and adjudge as these may incline the judicial mind. Grey v. Ohio, etc., R. R. Co., 1 Grant, Cas. (Pa.) 412; Varney v. Pope, 60 Me. 192; Bosley v. McKim, 7 Har. & J. (Md.) 468. Even in the case of a palpable violation of a public right to the annoyance of an individual, he must show the equity which requires this summary interference as the only adequate means of obtaining justice. Sparhawk v. Union Passenger Railway Co., 54 Pa. 401."

Fundamental and inexorable in its equality is the law that no person can have more rights than his neighbor, because fortune has so shaped conditions that the one owns more money or land or chattels than the other; but when there are two citizens, each of whom is engaged in a lawful business, one in mining, the other in farming, and there comes a conflict where neither can enjoy his own property without interfering to some extent with his neighbor in the enjoyment of his, then it is that the problem is presented how to fix the rights of each so as to secure to each the largest measure of liberty possible under all the circumstances of the particular case. Then it is that the court should so frame its decree as to avoid the destruction of the rights of either. In the western states, questions of such a nature often arise with respect to the uses of the waters of the streams where placer and quartz miners have to pollute the water to some extent before it flows down to the ranchmen, to be used by them in irrigation of the valley below; but the courts have solved them without compelling either to suffer irreparable damage, although, in the solution, each has to suffer a certain amount of inconvenience, and perhaps recurring damage. Equitable arrangements may often be made when we recognize the principle that, as a philosophic condition of the complexities of society, to some extent men must yield the full enjoyment of certain individual rights.

We therefore ask: Can both industrial and agricultural welfare be preserved under the exigencies of the whole case before us? If they may, the court will meet the situation by evolving a rule of conduct whereby both can exist together. The maxim, one must so use his rights as not to infringe upon the rights of another, must be upheld by preserving the absolute right to recover judgment for damages whereever substantial injury is shown; but there is no inconsistency between this principle and that which makes the writ of injunction a matter for the sound discretion of the court.

In reflection upon the intricacies of the suit, I cannot overlook the historical fact that Congress, through its beneficent legislation, invited the exploitation of the Rocky Mountains by prospectors for the precious metals, and that, as a result of the value and extent of the mines discovered in this and other mining states, population has increased, labor has been in demand, cities have been built, business has expanded, commerce has thrived, transportation facilities have changed and improved. What was a wilderness less than half a century ago has, principally through the development of mineral wealth, become a scene of energy and restless activity. With the miners there came ranchmen, who went into the valleys to raise produce and live stock, so that, grad-

ually, along with the mineral development has come a large measure of agricultural prosperity. Not many years since, under the progress of scientific learning, processes for the treatment of the lower grades of ore were discovered; mills to extract the metals became features of economical mining; and, in time, superseding the more primitive forms of reducing ores, smelting became practicable, and was only made available within Montana by the investment of large capital in industrial plants. In this forward movement defendants joined by the erection of their smelter, and it is a demonstrated fact that in its extensive ramifications the Washoe smelter and its operation have been a significant force toward the material development and upbuilding of the state of Montana, including the valley where complainant's lands are situated. Of course the business of copper smelting, like that of farming, is in itself lawful, though, in its conduct, some injury to others in the immediate vicinity of the smelter would seem to be unavoidable because of the arsenic in the smoke.

The result of testing the rights of Mr. Bliss, apart from his connection with the farmers' association, is this: That he can go into a court of law and recover ample compensation for his losses of 1905, 1906, 1907, and 1908, and up to the time of a verdict, no matter how great his damage might be. If he there recovered substantial damage for injury done him by the acts of the defendants, thus having separated the damages so done to his premises from those which are due to his own neglect, and thereafter should make a fit case to be followed by such an injunction as he prays for, the injunction would be in time to arrest the further progress of mischief; and I doubt if a ruling accordingly would be unjust in itself, while it would have highly valued precedent, for the Lord Justices of England, in Salvin v. North Brancepeth Coal Co., 9 Chancery Appeals, 705, made such an order in a suit where plaintiff sought a writ on the ground of smoke nuisance, to stop a large commercial work. Or, when we go to the farthest extent in treating this suit as really one which includes as quasi parties the farmers in the association, we still find that it might not be harsh to deny him any equitable relief herein, inasmuch as he refused to consider an offer of purchase of his place, not because the offer would not have afforded him complete satisfaction (for presumably it would), but because he had surrendered the control of his own affair to the farmers' association, and thus aligned himself with them in carrying out their threat that they would enforce their rights in equity unless defendants bought their lands and property outright for full values (which were the sums they deemed the measure of their damages), and unless such purchase was consummated by payments of such values in cash within 60 days after demand, and that, too, without according to defendants the privilege of having possible counter proposition entertained. So, from the view point of the relation of the farmers' association toward the defendants, a court of equity should be very reluctant to put defendants in the position the association would put them in.

In this respect, the case finds some analogy with that of New York City v. Pine, supra, where injunction was sought to restrain the city of New York from maintaining a dam on a river, and diverting the waters thereof from their natural flow through the farm of plaintiffs. The dam as completed damaged the property of plaintiffs in a substantial

sum. Injunction was issued, but ordered dissolved by the Supreme Court. Among other things, the court said:

"It is true the testimony discloses that the plaintiffs and the city had been trying to agree upon the amount of compensation, but that shows that the plaintiffs were seeking compensation for the injuries they would sustain, and were not insisting upon their alleged right to an abandonment of the work. It is one thing to state a right and proffer a waiver thereof for compensation, and an entirely different thing to state the same right and demand that it should be respected. In the latter case the defendant acts at his peril; in the former he may well assume that payment of a just compensation will be accepted in lieu of the right. In the latter the plaintiff holds out the single question of the validity and extent of the right; in the former he presents the right as the foundation for a claim for compensation, and his threat to enforce the right if compensation is not made is simply a club to compel payment of the sum he deems the measure of his damages. * * * If this injunction is permitted to stand, the city must pay whatever the plaintiffs see fit to demand, however extortionate that demand may be, or else abandon the work and lose the money it has expended. While we do not mean to intimate that the plaintiffs would make an extortionate demand, we do hold that equity will not place them in a position where they can enforce one."

Finally, in the last analysis, when, in connection with the attitude of Mr. Bliss, direct and vicarious, we weigh the uncertainty of his proof as to the amount of past damages done to his land, or of future damages to be done to his pastures by the acts of these defendants, together with the fact that he has not resorted to a court of law to recover any damages at all, and balance these matters against the stern fact that, if defendants are enjoined as prayed for, they must either buy the lands of the farmers at their own prices, or sacrifice their property; that, if enjoined as prayed for, their smelter must close; that, if it does close, their business and great property will be practically ruined; that a major part of the sulphide copper ores of Butte cannot be treated elsewhere within this state; that thousands of defendants' employés will have to be discharged; that the cities of Anaconda and Butte will be injured irreparably by the general effect upon internal commerce and business of all kinds; that professional men, banks, business men, working people, hotels, stores, and railroads will be so vitally affected as to cause unprecedented depression in the most populous part of the state; that the county government of one county of the state may not be able to exist; that the farmers of the valleys adjacent to Butte and Anaconda will not have nearly as good markets as they have enjoyed; that the industry of smelting copper sulphide ores will be driven from the state; and that values of many kinds of property will either be practically destroyed or seriously affected—remembering, always, that the courts of law are open to Mr. Bliss, I hold that, under the evidence, as he has submitted his case, discretion, wisely, imperatively guided by the spirit of justice, does not demand that injunction, as prayed for, should issue.

It does not necessarily follow, however, that his bill should be dismissed. This has been a litigation of over-much expense. Its consequences are of interest to many people, and, keeping in mind the essential fact that animal health is being affected, if there can be any reasonable preventive remedy applied by a court of equity, every larger consideration demands that it should be; that is to say, notwithstanding the denial of the writ, as prayed for, if a measure of

relief less than that which complainant has proved he is entitled to can be awarded to him, he should have it by some form of judicial order. Equity, having jurisdiction of the parties and the subject-matter, will therefore retain the bill, in diligent effort to afford all the relief reasonably possible under its allegations. Where the defendant has a clear ultimate right to do the act sought to be enjoined upon certain possible conditions, the courts will endeavor to adjust their orders so on the one hand as to give to the complainant the substantial benefit of such conditions, while not restraining the defendant from the exercise of its ultimate rights. McElroy v. Kansas City (C. C.) 21 Fed. 257.

I am always deeply sensible, too, how especially important it is, in the practical preservation of the equality of the law, that, when a man of limited means seeks relief against a corporation or individual of very great wealth, his property rights must be protected with scrupulous care against threatened or continuing unlawful encroachments, without unnecessarily forcing him into litigation so expensive or protracted that it may mean impoverishment or denial of substantial justice. Let it not be understood that, in saying this, I mean to imply that defendants herein have assumed any unfair attitude toward Mr. Bliss or others in the Deer Lodge valley. On the contrary, as the case is submitted, it appears that they were ready to treat with him and other landowners, and were willing to buy his land, and consider claims of injury; but their advances were checked by Mr. Bliss' refusal to sell, and by the ultimatum of March 4, 1905, from the association. Nevertheless, the court will not peremptorily turn the complainant away, but will use its power, already invoked in this suit, to give him such relief as may be reasonably possible, without destroying defendants' business; but, for lack of information, the court can now make no such specific order as will be just to both sides. Accordingly, after a study of the evidence of Mr. Mathewson, superintendent of the Washoe smelter, I take it upon myself as a chancellor to say that I am not satisfied that the construction of additional arsenic furnaces will not help the situation, or that there may not be some system of spraying the smoke and cooling the gases which will aid in settling flue dust, or that a greater width and height to the chambers may not be effective aids, or that a further system of filters may not be devised, or that briquetting flue dust may not be of help, or that an arrangement of bags may not be made, or other means applied, perhaps discovered since this suit was instituted, which will materially reduce the quantities of escaping arsenic. I therefore think the more equitable course to pursue is to call for further evidence with respect to the subject of adopting other or additional means to prevent the release of arsenic, to the end that I may be more fully advised in the premises before making final disposition of the case.

The order in the case is that the injunction, as prayed for, is denied; but the bill is retained for the purpose of enabling the court to receive further testimony as to possible means of so treating the flue dust as to reduce the quantities of arsenic now suffered to be released from the stack, and thereafter making any such specific order as may be equitable and right. As it is important that the matter be

disposed of before spring, the court will set the hearing of further evidence for Monday, February, 15th, at 10 o'clock a. m., and hereby directs that a subpœna be issued for Mr. Mathewson, requiring him to appear and testify at that time. Complainant and defendants may produce any witnesses they please, to testify upon the point stated, and the court reserves the right to call for others. Counsel for complainant and defendants will be notified of this order, and are requested to be present on the 15th of February to aid in the investigation, and in suggesting such further orders of court as may be justified. Costs to abide final order.