CARL E. THISTED ET AL., PLAINTIFFS AND RESPONDENTS, v.
COUNTRY CLUB TOWER CORPORATION, TOWER
MANAGEMENT CORPORATION, HIGHWOOD COR-
PORATION, JULIUS C. PETERS, JULIA H. PETERS,
JOHN H. DUNCAN AND MILDRED A. DUNCAN, DEFEND-
ANTS AND APPELLANTS.

No. 10809
Submitted April 15, 1965. Decided July 23, 1965.
Rehearing denied September 21, 1965.
405 P.2d 432

Howard C. Burton (orally), Great Falls, for appellants.

Swanberg, Koby & Strope, Hall, Alexander and Kuenning, Randall Swanberg (orally), Great Falls, for respondents.

HONORABLE GUY C. DERRY, District Judge, sitting in place of MR. JUSTICE JOHN CONWAY HARRISON, delivered the Opinion of the Court.

This is an appeal from the order of the District Court for Cascade County, granting an injunction against proceeding with the remodeling, reconstructing and converting the Country Club Tower Apartment other than for residential use. The cause was tried to the court, sitting without a jury.

The facts which give rise to the litigation now before the court are rather involved. Briefly stated, one Julius C. Peters, together with an architect, George H. Shanley, initiated and embarked upon a plan for the construction and subsequent habitation and operation of a Tower Apartment Building in Great Falls during the years 1954 and 1955. There had been considerable planning and much talk about the construction of such an apartment building in the nature of a co-operative apartment. In other states where such construction is in common use it is more commonly referred to as a condominium building. The last session of the Montana Legislature provided some rules for such type of construction, (See Chapter 120, Laws of 1965, now R.C.M.1947, § 67-2301 et seq.) but at the

time of the construction of the building here involved no applicable law was in effect.

The plan was for the construction of a multi-story apartment building eleven stories high, with two apartments on each floor, except for the eleventh story. A suitable location was available and this was on property the ownership of which was controlled by the defendant, Julius C. Peters. The Country Club Tower Corporation was formed for the purpose of construction of the building based upon architectural plans prepared by the Shanley firm and drawings and floor plans were available for exhibition to those interested in the purchase of apartments. A form contract was prepared for submission to prospective purchasers of apartments. A real estate firm was engaged as exclusive agents for the sale of the apartments. Brochures were printed based on information furnished to the realtors by the promoters for the purpose of advising prospective purchasers of the nature of the undertaking and the advantages of owning an apartment. It was represented that, among other things, the apartments were to be constructed on a communal group living type basis, where selected and congenial people could live in close proximity, but with separate ownership of definite space, whereby people would have standards of gracious living, nice apartments in a lovely district surrounded with their friends.

In the preliminary plans and the sales literature used there was no intimation that the Tower Apartment Building would ever be anything other than a residential building. During the same period, and because of some zoning restrictions, the site of the proposed building was changed so that the structure was actually built on a location about 1,000 feet west of the site originally selected. Two purchase contracts were actually entered into prior to completion of construction of the apartments. The form contracts informed the purchasers and prospective purchasers that the contemplated construction of an eleven-story tower building would contain twenty individual

dwelling units, with caretaker's quarters and garage section for twenty-five automobiles. The corporation proposed to sell and deed to the individuals in fee simple the different dwelling units in the building, together with one share of a total of Twenty shares in a corporation that was to be created to own, maintain and operate the community property in the building, consisting of the entrance, hallways, stairs, elevators, heating boilers, water and sewer connection, electric service, the garage, the land and all parts of the building outside of the dwelling units. The construction of the building was to be in accordance with plans and specifications prepared by George H. and Frank B. Shanley, architects.

The purchaser of each apartment was to pay the corporation, that would own and operate the community property, one-twentieth of the monthly operating expenses of the community property, estimated at $50.00 per month, and the owner of each apartment could attend meetings of the community corporation and have a voice in its management. A description and outline of the specifications for the apartments were annexed to the contract describing it as including caretaker's quarters, eleven two-bedroom dwellings, and nine three-bedroom dwellings, entrance lobby, corridors, boiler room, etc., and that in addition to the bedrooms each dwelling would have a living room, dining room, kitchen, two bathrooms, reception hall, four clothes closets and storage room, all of size and arrangements for gracious living.

Annexed to the proposed contracts was an architect's drawing of the exterior of the apartment building as it would appear on completion, together with a bird's-eye view of the layout of the building and garage and a typical floor plan setting forth the room layout of the two apartments on each floor, showing the location of the corridor, elevators, bedrooms, living room, dining room, kitchen, storage space, closets and halls. These contract forms provided purchasers and prospective purchasers with information in detail respecting the physical

characteristics of the Tower Apartments and the nature of the operation proposed for the building.

The land on which the building was built, as well as that on which it was originally proposed to be built, was owned by Highwood Corporation, of which defendant Peters was the controlling stockholder. It should be borne in mind that individual apartment owners were to own only the apartment purchased by them and pay taxes on their individually-owned apartment. The apartment was to be a shell and to be completed by the purchaser in many details, but the site, hallways and the lobby, elevators and garage were to be completed and owned by the corporation.

In December, 1954, Country Club Tower Corporation was formed by Peters, John Duncan, another defendant, and George H. Shanley, the architect. Hereafter for clarity this corporation will be called Tower. The record reveals that Peters is also the controlling stockholder in this corporation. The site of the building was deeded by Highwood Corporation to Tower and the latter then proceeded with the construction of the building. The building was not completed until late in 1956. When finished the building was owned by Tower. Prior to actual completion, during the period 1954-1956, two purchasers contracted in writing for apartments in the building.

In the fall of 1957 the promoters held an open house and at that time an informational pamphlet was distributed to the invitees, informing them, among other things, that the building was designed for spacious and gracious living, that there are *twenty-one apartments*, two on each floor, with the exception of the eleventh; that apartment owners will have assigned garage space and, in addition to ownership of his apartment, will own *one-twentieth of the community property*. This property consists of halls, elevators, garage and landscaped grounds and that "every effort is being made to have a congenial group of owners and applications for apartments and choice of

location will be allotted in the order firm commitments to purchase are received."

It is important to observe that in all contracts submitted to prospective purchasers and in all brochures put out by salesmen the building was referred to as an apartment building with twenty apartments, plus a caretaker's unit. Through issuance of but twenty shares of stock in the corporation, the control of the whole property was to be and remain in the owners of the twenty separate apartments. The deed to Mrs. Roberts, as well as other deeds issued, included "one share of stock in Tower Management Corporation allocated to said apartment."

The new corporation, called Tower Management Corporation, was formed by defendants Peters, Duncan and Shanley, and hereafter we shall refer to this corporation as Management. Three weeks after this new corporation was formed, Tower conveyed to Management the premises on which the building was located, excepting and reserving from the conveyance the following:

"* * * twenty (20) separate apartments located in said apartment building, which said apartments are described in the Plat of Country Club Tower Apartment House hereto attached, being Apartments numbered 1-A, 2-A, 3-A, 4-A, 4-B, 5-A, 5-B, 6-B, 7-A, 7-B, 8-A, 8-B, 9-A, 9-B, 10-A, 10-B, and 11-A, respectively; and likewise the Sun-Down Room located on the Eleventh Floor of said Apartment Building, and likewise the Garage Annex, being a portion of the Garage premises adjoining said apartment building."

Thus the apartment owners would own separately all apartments, and Management would own the servitudes necessary to operate the building. In turn, the stock being entirely owned by the owners of the twenty apartments, who would control the operation of the building and determine the occupancy.

The first purchasers of apartments, on which contracts were given and executed, were Elizabeth B. Roberts and Susan K. George.

While a contract was executed with Roberts and George which, in effect, showed that the apartment building would be used only for residential purposes, it appears that when Tower executed a deed for these apartments, as well as the other apartments in the building which were sold, being the individual units owned by plaintiffs, the restrictions referred to in the contract were not embodied in the deed. In their brief, the appellants make this statement:

"As expressed previously, it is the view of the appellants that the Roberts and George contracts were merged in the subsequent deeds; that the contracts, not being recorded or recordable, can have no impact upon the title as expressed in the deeds; that the deeds given by Country Club Tower Corporation to the owners of the individual units are totally free of restrictions upon use; and, that none can be raised thereon under the statutes and principles heretofore cited. If this be the case, there can be no question of concomitant restrictions reciprocating or bounding back upon the seven (7) units retained by Country Club Tower Corporation. None exist to reciprocate."

Ten of the apartments were sold to individual purchasers, one to Highwood Corporation, one to the defendant, Julius Peters, and another to his daughter and son-in-law. The remainder were not sold and remained in the ownership of Tower. It may be remarked that it could be assumed from the evidence that the defendant Peters, in the advantageous position of ownership of the majority of the stock in Tower, either made no particular effort to sell the unsold apartments or was unduly restrictive in attempting to find purchasers he thought desirable. Peters testified he did not encourage or contact any possible purchaser he did not deem desirable.

Be that as it may, Tower had some apartments owned by it; and the corporation, through Peters, proceeded without consulting the owners of the sold apartments (and by virtue thereof stockholders in Management) to remodel certain floors to

entirely change the character of the building from a residential apartment building to one of commercial character, with individual sleeping rooms designed for transient guests. Some evidence indicated Mr. Peters contemplated other changes which would further change the originally contemplated use of the building. In any event, the position of the defendants is that they have the right to use the apartments owned by the corporation in any manner they see fit and without regard to the wishes of the owners of the sold apartments and other stockholders of Management.

It having been established that some of these apartments had been sold and that the remainder were still in the ownership of Tower, the position of the appellants is made clear. It likewise provides the issues which are to be determined by this court:

(1) Under the factual situation here presented, do the equitable servitudes which attach to the transactions here involved require the interpretation placed thereon by the trial judge?

(2) Under the facts are the plaintiffs bound by the fact that the deed did not have restrictive covenants or may the plaintiffs show the actual agreement, as found by the trial court, by parol evidence and by the acts and conduct of the defendants?

 This is an action in equity and equitable principles govern. Likewise the trial court, having obtained jurisdiction for equitable purposes, had jurisdiction to give full relief, whether legal or equitable, for all purposes. Butler Bros. Dev. Co. v. Butler, 111 Mont. 329, 108 P.2d 1041.

██ A statement made in the case of Fey v. A. A. Oil Corp. 129 Mont. 300, 318, 285 P.2d 578, 587, has some application in this case. There the court said:

"Courts of equity are not bound by cast-iron rules. The rules by which they are governed are flexible and adapt themselves to the exigencies of the particular case. Relief will be granted

when, in view of all the circumstances, to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition. See Parchen v. Chessman, 49 Mont. 326, 142 P. 631, 146 P. 469."

The trial court made a finding, based on competent testimony, that representations were made in connection with the sales to Roberts and George and other purchasers, both orally and by written contract, and relied upon by them, which preceded their deeds, and which would sustain the trial court's decision.

Appellants cite certain California cases in support of their position, but there are differences in the California law and applicable Montana statutes. The rule outlined by the California court now appears to be in the minority.

The Montana statutes provide:

"93-401-13. (10517) *An agreement reduced to writing deemed the whole.* When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be between the parties and their representatives, or successors in interest, no evidence of the terms of the agreement other than the contents of the writing, except in the following cases:

"1. Where a mistake or imperfection of the writing is put in issue by the pleadings.

"2. Where the validity of the agreement is the fact in dispute.

"But this section does not exclude *other evidence of the circumstances under which the agreement was made, or to which it relates,* as defined in section 93-401-17, or to explain an extrinsic ambiguity, or to establish illegality or *fraud.* The term agreement includes *deeds* and wills, as well as *contracts between parties.*" (Emphasis supplied.)

"93-401-17. (10521) *The circumstances to be considered.* For the proper construction of an instrument, the circumstances under which it was made, including the situation of

the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."

Application of these statutes has been discussed by this court. Thus in the case of Bridges & Co. Inc. v. Bank of Fergus County, 77 Mont. 524, 537, 251 P. 1057, 1060, this statement was made:

"In McCaull-Dinsmore Co. v. Stevens [59 Mont. 206, 194 P. 213], supra, this court held that parol evidence was admissible to show that the contract there under consideration was delivered to plaintiff's agent for a purpose other than that for which the plaintiff was attempting to make use of it—as the basis of an action. In that respect the situation is identical with the one here presented.

"Defendant's evidence was competent, relevant, material, and did not infringe the parol evidence rule. We quote again, from Peugh v. Davis, 96 U.S. [332], 336, 24 L.Ed. [775], 776 (see, also, Rose's U. S. Notes): 'The rule which excludes parol testimony to contradict or vary a written instrument has reference to the language used by the parties. That cannot be qualified or varied from its natural import, but must speak for itself. The rule does not forbid an inquiry into the object of the parties in executing and receiving the instrument.' McCaull-Dinsmore Co., supra; Barkemeyer Grain & Seed Co. v. Hannant, 66 Mont. 120, 213 P. 208.

"*The face of an instrument is not always conclusive of its purpose.* The rule regards the circumstances of the parties, *and executes their real intention, and prevents either of the parties to the instrument from committing a fraud on the other* by claiming it to be what it in fact is not. In other words, *the real transaction may be proved.* Cabrera v. American Colonial Bank, 214 U.S. 224, 29 S.Ct. 623, 53 L.Ed. 974; (see also, Rose's U. S. Notes); Western Underwriting & Mortgage Co. v. Valley Bank of Phoenix [9 Cir.], 237 F. 45; Arizona Copper Estate v. Watts [9 Cir.], 237 F. 585. To permit the plaintiff to recover upon

the facts found by the trial court upon competent evidence would permit the perpetration of a gross injustice."

In the case of Platt v. Clark, 141 Mont. 376, 379, 378 P.2d 235, 236, 237, the Court used this language:

"This section does not exclude other evidence of the circumstances under which the agreement was made, or to which, it relates, as defined in section 93-401-17, or to explain an extrinsic ambiguity, or to establish illegality or fraud. *The term agreement includes deeds and wills, as well as contracts between parties.*

"The leading case of this jurisdiction recognizing this exception to the evidence rule and cited by the defendant, but not distinguished or denied by the plaintiffs is Smith v. Fergus County, 98 Mont. 377, 39 P.2d 193. Speaking with the above statute in mind this court at p. 390, 39 P.2d at page 197, said:

" 'These provisions of our law preclude oral testimony of agreements which contradict, change, add to, or subtract from a written contract purporting to embrace all of its terms. The cases in point are too numerous, and the rule is too well established, to require citation of authorities. However, under the statutory exception noted, "where the validity of the agreement is the fact in dispute," parol evidence is admissible, not to vary the terms of an instrument, but to show that *what appears on its face as a valid, binding contract, is, in fact, no such thing.'* Bridges & Co. v. Bank of Fergus County, 77 Mont. 524, 251 P. 1057, and McCaull-Dinsmore Co. v. Stevens, 59 Mont. 206, 194 P. 213; Stokes v. Tutvet, 134 Mont. 250, 328 P.2d 1096; Jensen v. Franklin, 135 Mont. 341, 340 P.2d 832."

We think that as applied here the provisions of section 13-708, R.C.M.1947, are applicable.

*"Several contracts—when taken together.* Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

In the case of Story v. Montforton, 112 Mont. 24, 31, 113 P. 2d 507, 508, the court considered a situation comparable to that of the parties to this action. The court quoted with approval an Iowa case, Thordson v. Kruse, 173 Iowa 268, 155 N.W. 334:

"* * * The court went on to say that whether there was a merger depended on the intention of the parties, and quoted from Reid v. Sycks, 27 Ohio St. 285, where it is said: 'In all cases of stipulations in a preliminary contract for the sale of land, of which the deed is not a performance, the true question is, whether the parties have surrendered those stipulations. This is a question of intention of the parties. *The evidence of that intention may exist in or out of the deed. There is no presumption that a party, in giving or accepting a deed, intends to give up the covenants of which the deed is not a performance or satisfaction.*'" (See, also, 5 Wigmore on Evidence, 2d Ed., p. 307, § 2430.)

In Williams Realty Co. v. Robey, 175 Md. 532, 539, 2 A.2d 683-686, it was said:

"It is a question of intention, and a clear manifestation of it must appear. North Beach v. [North Chesapeake Beach] Land & Imp. Co., 172 Md. 101, 115, 191 A. 71. It is not always, as is suggested by some questions asked witnesses here, the purpose actually in the grantor's mind that must be carried out. From expressions used, inducements extended, the law determines rights and obligations and not from subsequently disclosed mental operations to the contrary. Pomeroy, Equity Jurisprudence, secs. 811 and 1294. *This manifestation of intention need not be found in the conveyance; a sufficiently clear manifestation in a previous agreement must have the same result.* Newbold v. Peabody Heights Co., 70 Md. 493, 499, 17 A. 372, 3 L.R.A. 579; Peabody Heights Co. [of Baltimore City] v. Willson, 82 Md. 186, 32 A. 386, 1077, 36 L.R.A. 393; Pomeroy, Equity Jurisprudence, secs. 1294 and 1295."

In the Annotation, 84 A.L.R. 1009, the editor makes this comment:

"A very general exception to the foregoing rule relates to collateral stipulations incorporated in the contract but not in the deed. In this regard it is to be observed that a contract for a deed antedates the execution of the deed, and may, and often does, contain many provisions which the execution of the deed neither adds to nor takes away from. A deed is a mere transfer of the title, a delivery so to speak of the subject-matter of the contract. It is the act of but one of the parties, made pursuant to a previous contract either in parol or in writing. It is not to be supposed that the whole contract between the parties is incorporated in the deed made by the grantor in pursuance of, or the consummation of, a contract for the sale of land. There are many things pertaining to the contract which it is manifest are never inserted in a deed. Saville v. Chalmers (1888) 76 Iowa 325 [41 N.W.30]. *The instrument of conveyance may be complete for its purpose, which is to declare and prove the fact of conveyance; yet very naturally and commonly it is but a part execution of a prior contract, and parol evidence is admissible to show the true consideration for which it was given and all other parts of the transaction, not inconsistent with the recitals in the deed, provided the fact of conveyance is not affected by it.*"

Defendants assume that, because plaintiffs other than Elizabeth Roberts were not parties to the contract between Tower and Elizabeth Roberts they were not in privity with Tower, either as parties to the contract or as third-party beneficiaries. It appears clear that if any one of the apartment owners (here being Mrs. Roberts) who is in privity, under the facts and circumstances here. with the corporate defendant and has a right to relief, it would bind the defendants as to the whole building, because it would be impossible to segregate the use of the building or apportion its use among the apartment owners. The right to the use of said building as a residential apartment must necessarily apply to all or none.

It should be noted that in the warranty deeds dated June 6,

1957, by which Tower conveyed the apartment building to Management, reserving apartments to the grantor, the grantor reserved the apartments themselves, the Sun-Down Room located on the eleventh floor and the Garage Annex and nothing else whatsoever. There was no reservation of the right of access through the portion of the building transferred to Management.

Such rights, if any are to exist at all, must be implied. By this deed it is quite clear that there was created a separate ownership in Tower of twenty cubicles of air located within the outer confines of the apartment building, and with all the structural portions of the building owned by Management. A perfectly legal situation arose from this transfer, but if we do not imply the additional use of the structural portions of the building owned by Management the owners of the apartments would not be able to get to them, heat them, get lights, water and other utilities to them. It appears obvious that since the ownership of the apartments are separate, all of these rights must necessarily be implied from the fact of the creation of separate ownership of the air spaces and the structural portions of the building; and, second, it is perfectly clear that the implied equitable servitudes and reservations thus created were to be enforced through the medium of stock in Management. Under the articles of incorporation and by-laws, which have been admitted in evidence, the corporation was to own no other property and have no other powers than that of managing the common property in the twenty-unit apartment building designed for individual ownership.

The warranty deeds executed by Tower in each case have a clause providing that a majority of the apartment owners must agree on the selection of owners of apartments in the building on resale or lease by the purchaser which accrues to each purchaser of an individual unit. In each case they were required to agree to give Management what amounts to a first refusal of the property in event any purchaser sought to sell to an undesirable tenant. The deed to Elizabeth Roberts has the

agreement attached to and made part of the deed and, save for names, is identical with all other deeds issued. It reads as follows:

"IN CONSIDERATION of the execution and delivery of the attached conveyance to her, undersigned, ELIZABETH B. ROBERTS, a widow, (herein called Apartment owner), for herself, heirs, representatives and assigns, covenants and agrees that she will not sell or sublease said Apartment 9-A to anyone without first securing written approval thereof from the holders of a majority of the stock of TOWER MANAGEMENT CORPORATION (said shares being twenty (20) in number), provided that if the majority of said shareholders refuse to give such consent to a proposed sale or sublease, then Apartment Owner shall give said Tower Management Corporation the option to purchase said apartment and the one (1) share of the capital stock of Tower Management Corporation allocated thereto at the price hereinafter set forth. Said Tower Management Corporation shall have the right to exercise said option during a period of ten (10) days after a written proposal for the sale of said apartment and stock to it at said price has been served upon the corporation. The price shall be an amount equal to the original cost of said apartment and stock to Apartment Owner (including decorating and the installation of fixtures which become a part of the apartment property) less depreciation computed at the rates approved by the Bureau of Internal Revenue, and less the total of all valid and subsisting liens on the premises.

"In the event the corporation does not exercise said option within said ten (10) day period, then the proposed sale or sublease may be made, provided it is completed and title is transferred within sixty (60) days after expiration of said ten (10) day period. If not so completed within said sixty (60) day period, then all the above restrictions and conditions as to sale or sublease shall be reinstated, and Tower Management Corporation must again be offered the option as above set forth.

"IN WITNESS WHEREOF, I have hereunto set my hand and seal this 16 day of Oct. 1957.

/s/ Elizabeth B. Roberts"

When we bear in mind that before any deeds were issued to ultimate purchasers Tower owned all of the apartments and Management owned the building and that the deed between the two reserved no easements whatsover, it is clearly apparent that all of the rights which alone would make the apartments habitable and therefore salable, of necessity had to be implied from the deed between the Tower Corporation and Management.

The position of the defendants being that since the deeds to plaintiffs or their predecessors did not contain covenants setting forth the character of the scheme projected by the promoters, plaintiffs are without remedy, and that such covenants are enforcible only if they are included in the deeds, we must decide whether the defendants' argument, based upon a line of California dcisions, must be adopted by this court in view of all the facts and circumstances shown by the evidence and determine whether there are, in addition to the conditions found in the Roberts' contract and deed, from the very nature of the building plan and operation, about which there is no dispute, implied conditions and equitable servitudes that require the use of said building for residential use and not for commercial purposes.

We think certain Montana statutes, under the facts in this case, are controlling:

"13-722. (7547) *Necessary incidents implied.* All things that in law or usage are considered as incidental to a contract, or as necessary to carry it into effect, are implied therefrom, unless some of them are expressly mentioned therein, when all other things of the same class are deemed to be excluded."

"67-1607. (6865) *What easements pass with property.* A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real prop-

erty of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed."

"13-721. (7546) *Reasonable stipulations — when applied.* Stipulations which are necessary to make a contract reasonable, or conformable to usage, are implied, in respect to matters concerning which the contract manifests no contrary intention."

"49-114. (8751) One who grants a thing is presumed to grant also whatever is essential to its use."

"49-121. (8758) That which ought to have been done is to be regarded as done, in favor of him to whom, and against him from whom, performance is due."

█ We are further of the opinion that under all the facts shown in evidence here and as heretofore referred to herein, an implied equitable servitude attached to the transfers of the apartments in question, requiring the use of the apartments for residential purposes only.

"67-606. (6754) *Extent of servitudes.* The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired."

█ By reason of our statutes and what has been heretofore said, there can be implied reservations or implied grants of easement by necessity in Montana, and insofar as the holding in Simonson v. McDonald, 131 Mont. 494, 311 P.2d 982, states to the contrary we must observe that the language therein used was too broadly put and should have been limited in its application to the facts existent in that case. Under the facts and circumstances existing here that holding is expressly overruled. (See criticism of Simonson v. McDonald in Vol. 19, Montana Law Review, page 73.)

The judgment of the district court should be, and accordingly is, affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, DOYLE and CASTLES concur.