DAVID DUTTON, ET AL., ET PLAINTIFFS AND APPELLANTS, *v.*
ROCKY MOUNTAIN PHOSPHATE, INC., DEFENDENT AND
RESPONDENT. EDWARD MOLLENBERG ET UX., PLAINTIFFS
AND APPELLANTS, *v.* ROCKY MOUNTAIN PHOSPHATE,
INC., DEFENDENT AD RESPONDENT.

No. 11540.
Submitted Jan. 13, 1969.
Decided Feb. 14, 1969.
450 P.2d 672.

Boone Karlberg, Missoula, Karl R. Karlberg (argued), Missoula, Alfred F. Dougherty (argued), Helena, for appellants.

Knight, Dahood & Mackay, Anaconda, Malcolm MacCalman (argued), Deer Lodge, for respondent.

MR. JUSTICE CASTLES delivered the opinion of the court.

This is an appeal from a judgment permanently enjoining Rocky Mountain Phosphates, Inc. from emission of fluorides in excessive quantities and beyond safe limits into the atmosphere at its plant in Garrison, Montana. The appeal is by the plaintiffs, arguing essentially that the injunction did not go far enough; that is, that the phosphate plant should have been enjoined from operating forever rather than just be enjoined from emitting fluorides in excessive quantities.

These cases have been before this Court on appeal in causes No. 11205 and 11214. Our opinion is found in Dutton v. Rocky Mountain Phosphates, Inc., 151 Mont. 54, 438 P.2d 674. We upheld the judgment for damages but directed that the injunction feature be reopened. We shall not repeat the matters appearing in that opinion for background here. However in that opinion, one of the factors noted to properly comment on the damage feature, including punitive damages, was the method of trial. In noting the method of trial and the evidence adduced, the trial court originally set up independent testing; and, it became apparent that the State Board of Health in its official capacity was involved. We analyzed the injunction feature as follows:

"Finally we have the question of the permanent injunction. The language of the Federal District Court in the Bliss case (Bliss v. A.C.M. Co., [C.C.], 167 Fed. 342) cited above is applicable here. Can the defendant and the plaintiffs live together?

"The trial judge denied the permanent injunction. We believe under the evidence before the court at that time this decision was correct. The last testimony was that the Aero-Tech scrubber was 98 percent effective and that the plant

could not operate without the scrubber operating. This scrubber was installed February 14, 1966. The trial began March 21, 1966.

"The trial court as Finding of Fact No. 7 found as follows:

" 'That originally the defendant's operation required that the raw phosphate rock be treated with sulphuric acid and phosphoric acid which made it impossible for defendant company to treat the smoke and gases given off in the kiln with water sprays; however, in March of 1965, defendant company changed its process by eliminating the use of sulphuric acid and by adopting the use of soda ash. That after the inception of this new process the defendant installed a system of water sprays which treated all of the smoke and gas given off by the kilm before such effluents were released into smoke stack. Tests of hay samples and other tests taken during the year 1965 indicate that such system of treating the smoke and gases with water sprays effectively removed approximately 95% of the fluorides given off in the manufacturing process. That since that time, in fact in January of 1966, the defendant company installed a new wet scrubbing system manufactured and installed by Aero-Tech Industries of Greenwich, Connecticut. That the defendant cannot operate its kiln without operating such scrubber; that testimony was given by a chemical engineer employed by the manufacturer of such scrubber which indicated that the newly installed scrubber is removing more than 98% of the fluorides released from the phosphate rock and that the gross amount of fluorides actually emitted into the atmosphere is substantially less than seven pounds per hour when gross production rate is approximately 70 tons per day; that the operation of defendant's plant will not result in the emission of quanties of fluoride into the atmosphere that will damage hay or grass raised by the plaintiffs and it will not therefore result in damage to plaintiffs' livestock.'

"However, as detailed above, Mr. Rhodes is an expert, he

knew what the fluorides would do. His testimony seemed to be that when they started in the Garrison area the fluorine toxicosis occurred sooner than he expected it to. Further, it is apparent that Rhodes knew of scrubbers available for installation in this operation which would control the emission of fluorides. The conclusion is inescapable that the defendant was prodded each step of the way by the courts to make the scrubbers effective and efficient.

"At the oral argument on the injunction feature of this appeal, it was brought out that the State Board of Health had objected to emissions of fluorides by this defendant very recently.

"It is also a fact that the plaintiffs have had the burden of proving after each change in operation of the defendant, that they were still being damaged. We recognize, also, that in such a case many other necessary expenses are not recoverable.

"We are here dealing in equity. The statement made in Thisted v. County Club Tower Corporation, 146 Mont. 87, 94, 405 P.2d 432, and again in Thisted v. Tower Management Corporation, 147 Mont. 1, 15, 409 P.2d 813, is appropriate.

" 'Courts of equity are not bound by castiron rules. The rules by which they are govered are flexible and adapt themselves to the exigencies of the particular case. Relief will be granted when, in view of all the circumstances, to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition. See Parchen v. Chessman, 49 Mont. 326, 142 P. 631, 146 P. 469.' Fey v. A. A. Oil Corp., 129 Mont. 300, 318, 285 P.2d 578.

"This Court feels under the law of the case as stated above it would be an idle act to restrain or enjoin the defendant from emitting fluorides or fluorine compounds in toxic quantities into the atmosphere.

"As stated above, the trial court under the evidence at that time properly refused the injunction. However, equity demands

that the trial court should reopen the injunctive feature of the case and require the defendant to establish that its operation is now within reasonable limits and that its operation will not result in the emission of quantities of fluorides into the atmosphere that will damage hay or grass and it will not, therefore, result in damage to livestock.

"*To determine the question of the reasonableness of the defendant's operation, the trial court 'may appoint the State Board of Health or any other inspection agency it desires.* The cost of said inspection and report to the court shall be at the expense of the defendant, the Rocky Mountain Phosphate, Inc. (Emphasis added).

"This order does not mean the court is to be saddled with policing the operation of the defendant indefinitely, but merely to find the fact whether the defendant since March 1966, to the time of the hearing to be had has been operating within safe limits.

"If the operation has been within safe limits the injunction will be denied. If the operation has not been within safe limits as found by the trial court, appropriate action will be taken."

Pursuant thereto on April 11, 1968, Rocky Mountain Phosphates was ordered to show cause in the following matters:

"1. That the scrubbing system as testified to before this Court is now installed by the Defendant, is now working as efficiently as promised by the Defendant's officers and agents before this Court from March 21, 1966 until April 2, 1966.

"2. That the operation of Defendant's plant since the hearing before this Court has been such that the emissions of fluoride from this plant have not damaged the hay nor the grass raised by the Plaintiffs during that time of operation."

After a review of the evidence, the trial court found:

1. That the scrubbing system testified to by the defendant's officers and agents during the trial of this cause between March 21 and April 2, 1966 broke down or otherwise became inoperative within a period of six to eight months after the

trial, that the said scrubbing system did not operate as efficiently as promised by the defendant's officers and agents before this Court during the trial of March 21, 1966 until April 2, 1966.

"2. That during the period of May 9, 1966 to date of hearing this Order to Show Cause, the average fluorides in grass in the Garrison area was above safe limits, extending as high as 586 parts per million average of all samples taken by the Montana State Board of Health in December of 1966, or sixteen times the standard for ambient air set by the State of Montana.

"3. That the enormous increase in fluoride content of grasses as compiled by the Montana State Board of Health coincided with the installation of scrubbers designed and constructed by the Defendant.

"4. The operation of the defendant's plant at Garrison, Montana since the trial of the case ending April 2, 1966, has been such that the emissions of fluoride from defendant's defluorinating plant at Garrison, Montana have damaged the hay and the gras raised by the plaintiffs subsequent to April 2, 1966.

"5. That since March, 1966 to April 11, 1968, the defendant has not been operating its defluorinating phosphate plant at Garrison, Montana within safe limits."

After the foregoing findings of fact, Judge W. W. Lessley issued the following conclusion of law:

"That the continued emission from the defluorinating phosphate plant at Garrison, Montana of fluorides in excessive quantities and beyond the safe limits constitutes a nuisance, and the same should be permanently enjoined."

Based on the above quoted findings of fact and conclusions of law, Judge W.W. Lessley, on June 19, 1968, entered a judgment as follows:

"That the defendant, Rocky Mountain Phosphates, Inc., its directors, officers, agents and employees, be and they are

hereby permanently enjoined from operating the Rocky Mountain Phosphate plant at Garrison, Powell County, Montana, and that plaintiffs have judgment for their costs."

Thereafter, on motion of the defendant to amend the judgment to conform to the findings of fact and conclusions of law, the court, on July 12, 1968, entered an amended judgment which was as follows:

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED, That the continued emission from the defendant's defluorinating phosphate plant at Garrison, Montana, of fluorides in excessive quantities and beyond safe limits constitutes a nuisance, and the same is hereby permanently enjoined."

The plaintiffs have appealed from the amended judgment and request that the same be vacated and that the original judgment be reinstated.

Meantime, and during the pendency of this appeal, another district court action occurred. This action arose out of a situation wherein Rocky Mountain Phosphates was ordered to shut down its operation by the State Board of Health. The legislature in the 1967 session in the Air Pollution Act, Chapter 313, Laws of 1967, gave the State Board of Health, among other things, the duty to prevent air pollution injury.

In September of 1967 (note the date is while the previous cases were on appeal to this Court) Rocky Mountain Phosphates was ordered to close its plant unless it entered into an agreement with the State Board giving that board summary powers. An agreement was entered into. In March 1968, the plant was closed. The old Aero-Tech scrubber referred to in our previous opinion was abandoned. A new "Teller" scrubbing system was financed and installed. The new system was finally completed in the fall of 1968. When the State Board of Health refused to inspect or approve the new system because it had not been completed on a specified date, May 31, 1968, the Rocky Mountain Phosphates, Inc. sought a restraining order to restrain the Board of Health then in this Court's

Cause No. 11580 sought a writ of supervisory control from this Court. The parties here were the State Board of Health and the District Court of Powell County and Rocky Mountain Phosphates, Inc. The parties did not include the appellants in the instant case. However, the very essence of the instant case, the faulty and detrimental operation of the Aero-Tech scrubber and its resultant contamination had been abandoned.

On November 15, 1968 this Court issued its order as follows:

"PER CURIAM:

"The relator, State Board of Health and its members, sought a Writ of Supervisory Control or other appropriate writ, directed to the District Court of the Third Judicial District in the County of Powell, seeking in the main to set aside and hold for naught a certain restraining order and order to show cause issued on November 4, 1968, returnable before that court on November 14, 1968. This Court issued an order setting aside the restraining order and certain other matters directed essentially at the operation of Rocky Mountain Phosphates, Inc. in its kiln operation in Powell County.

"We shall briefly observe that a decade of operation by Rocky Mountain Phosphates, Inc., hereinafter called the Company, has produced numerous law suits and controversy over what we shall call simply air pollution. The manufacturing process of defluorinated phosphate, an animal feed supplement, removes fluoride compounds from phosphate rock. In the process, an excess amount of injurious fluorides have been emitted into the atmosphere. A culmination of events resulted in the Relator 'shutting down' the operations. Finally, an agreement was reached which briefly allowed temporary operation of the plant under very stringent restrictions, employment by the Company of an acknowledged expert in air pollution control to supervise and design a new, modern, 99.9% effective air scrubbing device to permit safe operation of the plant. The agreement provided, in context we observe with its main pur-

pose—that of air pollution control—for completion of the permanent system by May 31, 1968. The agreement further has what might be called a 'summary power' in the Relator Board of Health to close the plant for any violation of the agreement. This 'summary power' is couched in terms of consent by the Company to the entry of a court order without notice for breach of the agreement. The agreement was dated Sept. 9, 1967.

"The 'temporary' operation became defective so far as air pollution was concerned in March of 1968 and the plant closed.

"Meanwhile the Company did many things to comply with the agreement. It hired the expert, it designed the new scrubber, it arranged financing. However, it did not have its new system complete by May 31, 1968.

"Therein apparently lies the fulcrum of the present problem. The Relator from and after May 31, 1968 took the position that, the new scrubbing system not having been completed, the Company was out of business in Powell County.

"The Company went ahead, advising the Relator of its progress. It arranged financing through Hooker Chemical Co., it built the new scrubber. It advised the Relator Board of its completion and sought approval. The Board simply did nothing. It did not inspect, it did not approve; it did nothing except indicate that so far as it was concerned the Company was finished.

"Thus, on Oct. 29, 1968, the Company filed its Complaint in respondent District Court alleging in substance compliance with its agreement, and refusal of the Board to inspect; but further that a controversy existed concerning the contract terms. As a result thereof, ex parte, the respondent District Court issued the injunction order.

"On Nov. 15, 1968 a return and answer was made, the matter fully argued.

"As to the significance of the May 31, 1968 completion date of the new scrubber, it is clear that, taking the contract by its

four corners, the date was a terminal date for the temporary system. After the plant closed in March, that date had no more significance. Now at this date, the other provisions of the contract remain in force.

"In construing the rights of the parties, this Court makes its Order as a substitute for that of the District Court as follows:

"IT IS ORDERED and this does so ORDER that the defendant be restrained from proceeding against the plaintiff under the terms of said contract except as hereinafter provided. However, this Order is not to be construed in any way as inhibiting, limiting or restricting the Board from proceedings against the plaintiff in the event that the plaintiff should operate its plant in violation of any statute, lawful regulation or terms of the contract between the parties other than paragraph 15 as to completion date, and that part of paragraph 17 requiring prior approval to a testing operation. All other parts of said contract shall be operable to prevent operation of the plant in any violation of existing ambient air quality standards for fluorides.

"The matter is returned to the District Court of the Third Judicial District for its continued jurisdiction in conformance with this order."

Previously we have referred to the manner of trial as having a bearing on the discussion of damages. It is completely apparent we think, from our efforts here to show the continuing events, that the Company operation concerned with in Causes No. 11205 and 11214 has been completely stopped. The supervision and control has been taken over by the State Board of Health. The Company has complied with its contract with the State Board. It is a new operation and different. Our order previously quoted places complete jurisdiction in the District Court and in the State Board of Health.

In the light of all of these matters, a discussion of whether the injunction appealed from went far enough would

seem to be now academic. Conditions have changed, the new State law, the new duties and authority of the State Board of Health, the new ambient air standards, the contract, the Company's new scrubber and all of these matters make discussion of the original issues moot.

The Company has in fact relinquished its statute as a free agent and submitted to the supervision of the State Board of Health in matters of air pollution.

During oral argument, counsel for appellants asserted that nonetheless, since the appellants were not parties to the subsequent events, they were not bound by them. Yet the district court had all of this information before it and the rule stated in First National Bank in Billings v. First Bank Stock Corp., D.C., 197 F.Supp. 417, that where parties have discontinued acts of which complaint is made, the questions become moot and injunctive relief should not then be granted.

We hold then that the district court was correct in refusing to enjoin the Company in all operations and in only enjoining the emission of fluorides in excessive quantities. The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and THE HONORABLE BERNARD THOMAS, District Judge concur.

MR. JUSTICE BONNER did not participate.

THE HONORABLE PAUL G. HATFIELD, District Judge (specially concurring).

I concur with the result of the other judges in this matter, but not with the reasons stated.

To permanently restrain the operation of the defendant is an extremely harsh remedy and should only be used as a last resort after all else has failed.

The Bliss case cited in the main opinion, states the question: "Can the defendant and the plaintiffs live together?

The majority states that the operation of the defendant has changed. That the acts complained of have terminated. Only one act, the defective scrubber, has changed. Even since the hearing of April 1966, the Aero-Tech scrubber is gone. A subsequent scrubber designed and built by the defendant, apparently on the design of the Aero-Tech scrubber, has been scrapped. A temporary Teller scrubber operated for six months and has been scrapped. It is not clear if the defective stack has been repaired or replaced. The juncture of the kiln and the stock or scrubber was leaking so that the scrubber had no chance to scrub the gases. The testimony before the District Court was to the effect that a new gasket arrangement had been recently installed, but then only on one of the kilns and one had not been repaired. Also, throughout the history of the operation of this defendant, since it started in Garrison, and before in Butte, improper maintenance and improper use of materials necessary for the operation of the scrubber system has been a chief factor in the emission of the fluorides and also in the destruction of the scrubber systems.

All this testimony was before Judge Lessley in the District Court. He finally decided not to close the operation. We were informed at the oral argument on this appeal that the new scrubber is being tested by the State Board of Health.

The question in this lawsuit is the safe operation of this plant by the defendant. In my opinion this question has not become moot and certainly it is not merely academic to the plaintiffs in this action.

However, because circumstances have changed as they have been set out by the majority opinion and, further because the executive branch of government through the State Board of Health is policing the operation of the defendant, I feel that the judgment of the District Court should stand.

If there is a violation of the injunction, it can then be brought to the attention of Judge Lessley in the District Court.

It is difficult to see how this can be accomplished if the majority rule is adhered to.

That is to say, if the operation has become moot and merely academic, what recourse do the plaintiffs have for violation of Judge Lessley's restraining order? It may be true that equity is not bound by cast iron rules, but in order to avoid chaos and for anyone to be able to predict with any certainty what must be done in case of a violation of Judge Lessley's order, the equity court must be a court of rule.