BILL LONEY AND IRVING T. COOPER, PLAINTIFFS AND RE-
SPONDENTS, v. VANCE PETTAPIECE AND LUCY PETTA-
PIECE, DEFENDANTS AND APPELLANTS.

No. 11780.
Decided June 15, 1970.
On Rehearing Nov. 6, 1970.
475 P.2d 999.

.(1)

2

Smith, Emmons & Baillie, Great Falls, Robert Emmons, argued, Great Falls, for appellants.

John M. McCarvel, argued, Great Falls, for respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is a case in equity heard by the district court of the eighth judicial district, Cascade county, sitting without a jury, to determine that plaintiffs and defendant had formed a partnership for the development of certain real estate; for an accounting of said partnership, and for the dissolution of the partnership and sale and distribution of its assets. Judgment was entered for plaintiffs and defendant appeals.

In early April 1963, defendant, Vance Pettapiece, received a deed for certain land in the county of Cascade from one Jim Haley for a consideration of $7,000. On April 5, 1963, defendant and his wife Lucy executed a note and mortgage to the Stockmens Bank of Cascade for $6,900. At the same time, at the bank's insistence, one Hugh Bent guaranteed the mortgage and note and defendant and his wife executed a quit claim deed to Hugh Bent, which was placed in escrow at the Stockmens Bank. Several years later, in 1965, Hugh Bent died and the bank returned the quit claim deed to the defendant early in 1966. The note and mortgage was payable in annual installments of $1,500 with the first payment due in December 1963.

At the time of the above described transactions defendant was without steady employment. For only a $100 down payment, he had acquired some 91 acres of land which later turned out to be a good business venture but within 8 months he faced the necessity of making the first annual payment of $1,500. Several days after the transaction for the land the plaintiff cowboys, Bill Loney and Irving T. Cooper, entered the business venture.

The testimony reveals defendant Vance Pettapiece learned that one or both of the plaintiffs were interested in his property. Plaintiff Cooper's interest being to develop the property into a rodeo arena; plaintiff Loney saw it as an investment only if Cooper would provide the labor to create the rodeo arena. Pettapiece had bought the property with the intention of using it as a training track for horses and for horse barns. Defendant met with plaintiffs at Murrill's Bar in Cascade and they orally agreed to purchase the property, each of the parties to pay one-third the cost thereof, each to contribute labor and/or materials equally in the development of the property and all profits to be divided equally.

Defendant Pettapiece testified he had agreed with Bent that no interest in the land would be transferred until the

note was paid in full and that he had informed plaintiffs of this agreement. Plaintiffs denied knowledge of defendant's agreement with Bent. The court found that the plaintiffs may have known Bent guaranteed defendant's note, but they did not know of an agreement between Bent and defendant to the effect that no interest in the land would be transferred until full payment had been made.

For several years the oral agreement between plaintiffs and defendant was recognized and fulfilled by the parties. The plaintiffs each made this proportional share of payments to the Stockmens Bank on the note and mortgage. The bank recognized the oral agreement and recorded each payment for the years 1963 and 1964. By the spring of 1965, enough work had been done to create a rodeo arena. The parties opened a joint account at the bank and borrowed $1,000 to purchase lumber for seats at the rodeo grounds. This note was paid off by all three men from the receipts of several rodeos.

During the two years it took to develop the acreage into a rodeo arena the associates benefited from an unanticipated hay crop that made the annual payment of $1,500. During the two year period it appeared that plaintiff Cooper had performed the bulk of the manual labor necessary to create the rodeo arena. Loney, who was fully employed as a ranch foreman, supplied money and materials as his part of the venture and performed some manual labor. By the fall of 1965, Loney estimated he had about $4,000 invested. Defendant Pettapiece testified that he had averaged about 30 hours a week for the first 2 years, 1963 and 1964, and during the last 2 months before the rodeo in 1965 he had spent almost every day in manual labor at the rodeo arena.

The first rodeo was held in May 1965, followed by 2 others during the summer, and from the testimony it appears that the partnership or joint venture began to disintegrate at this point. The plaintiffs allege that the reasons were

several (1) defendant began to realize by 1965 that just cutting the hay and selling it would provide the annual payments, (2) defendant refused to give them an accounting of the earnings of the 3 rodeos, (3) that because of the fact they could not get an accounting they were advised by the bank to get their names on the deed to protect their interests; that defendant refused to sign such a deed until the property was paid for, and (4) defendant also refused to provide such a deed due to the fact "Cooper and I [Loney] would get together and try to beat him out of his third".

Defendant contends plaintiffs knew of his agreement with Bent and refused to make any further payments after 1964, although he acknowledges they offered a 1965 payment if he would sign a deed giving each of them a one-third interest; further that his wife's dower interest must be taken into account.

At trial it was clearly brought out through cross-examination of the defendant that from the very outset of his association with plaintiffs defendant knew it was a joint venture and plaintiffs would each receive a one-third interest. When cross-examined defendant testified as follows:

"Q. Now are you denying there was a three-way agreement with reference to the income from the rodeo and expenses? A. No.

"Q. You admit that? A. Yes.

"Q. You were sharing a third in that, weren't you? A. In the rodeo, yes.

"Q. Any question about that? A. No.

"Q. And you always admitted that you made an agreement with Cooper and Loney here that they would pay a third of the land payment, plus seven per cent interest annually, for the purchase of the land, you admit that, don't you? A. Yes.

"Q. Is that right? A. Yes.

"Q. Now, did you expect that they were going to buy the land and not have any interest in it? A. No.

"Q. How do you explain that then? A. I couldn't give them any interest in the land until it was completely paid off.

"Q. How do you explain the agreement that they were to pay one-third of the land payment plus interest? A. I told them the day we agreed on this that the situation was that Mr. Bent had signed a note for me, and the agreement was with him that I could not sell any of the land or tear up any of the buildings or destroy the hay ground, or anything on that order, and if they wanted to go along with it, fine, but they would have to wait until it was completely paid off.

"Q. All right. Now, so you do admit they were going to buy this land after this Bent thing was clear? A. Yes.

"Q. They were paying the money to purchase the land, right? A. Yes.

"Q. There is no question about that, is there? A. No.

"Q. And that's why each of you were paying $500.00 annually, plus the interest, right? A. Right.

"Q. You don't deny that you went to the bank with Jean and Sam Somers, and told the bank, or told Mr. Wells over at the First National Bank, that these two fellows had a one-third interest in that land; do you deny saying that? A. That they each had a third interest?

"Q. Yes. A. No.

"Q. You admit saying that, don't you? A. Yes.

"Q. So they did have a third interest in the land then as far as your agreement was concerned? A. Yes.

"Q. So when did you change your mind, then; at that time, in 1965, in November and first part of December; you admit they owned a one-third interest in the land in accordance with your agreement with them, right? A. They hadn't made the '65 payment on it. Up until then.

. "Q. But they had, you just stated, and you admit, that that was the agreement, that they owned a one-third interest in that land at that time. A. Up until '65 they made the payments.

"Q. Yes. A. Yes.

"Q. So they owned a third interest, right? A. Yes.

The trial court found there was a joint venture with each of the parties entitled to a one-third interest in the land and improvements. The plaintiffs were to pay their one-third share of the principal and interest on the note and mortgage and taxes. The defendant's interest was chargeable with his wife's dower interest and that if the parties could not settle the matter amicably, the land and improvements were to be sold and the proceeds divided between the parties equally and that defendant Pettapiece's share be charged with his wife's dower interest.

Appellant sets forth some 13 issues for review focusing error on the trial court's findings of fact and conclusions of law. Certain of these issues will be combined for discussion purposes due to the fact they pertain to one basic issue.

The issues directed to the court's findings, conclusions and judgment charging defendant's one-third share with the wife's dower interest will be first considered. Appellant's position is that being married at the time the deed was made to him on April 5, 1963, and because his wife was dismissed as a party to the action, the court erred in charging his share with his wife's dower interest. Also, that the dower right could not be measured in dollars and cents.

We find no merit to appellant's argument that the dower interest cannot be measured in dollars and cents. On the day of purchase the land value was $7,000 and the note and mortgage executed by them was in the amount of $6,900. Appellant had but a $100 interest. He took the deed in his own name, not his and his wife's. Therefore,

at the time of the deed and at the time he dealt with the plaintiffs a few days later, the dower interest was a inchoate one-third life estate in her husband's interest in the land, valued at $100. Even this was subject to a purchase-money mortgage and note which she had executed and become obligated to pay.

This is an action in equity where equitable principles prevail. The trial court having obtained jurisdiction for equitable purposes, had jurisdiction to grant relief, whether equitable or legal, for all purposes. Thisted v. Country Club Tower Corp., 146 Mont. 87, 405 P.2d 432.

A statement from Fey v. A. A. Oil Corp., 129 Mont. 300, 318, 285 P.2d 578, 587, has some application in this case. There the Court said:

"Courts of equity are not bound by castiron rules. The rules by which they are governed are flexible and adapt themselves to the exigencies of the particular case. Relief will be granted when, in view of all the circumstances, to deny it would permit one of the parties to suffer a gross wrong at the hands of the other party who brought about the condition. See Parchen v. Chessman, 49 Mont. 326, 142 P. 631, 146 P. 469."

Here, the wife knew within a week after her husband received the deed that he had made an agreement with the plaintiffs whereby they were to make two-thirds of the annual payments as against her husband's one-third; she knew, or should have known that one of the plaintiffs spent nearly a full work year to improve the property; she knew that she had paid nothing beyond the one-third payment of principal and interest on the note and mortgage which she executed and was obligated to pay according to the terms of the note and mortgage for the years 1963 and 1964. Her knowledge and acquiescence in these details must in good conscience limit her dower interest to an inchoate one-third life estate in that interest owned by her husband.

If the wife has any dower interest other than what appears in the record before us, her contest will be in another action. Perhaps she should not have been dismissed as a party defendent, but the appellant cannot rely on her dower possibilities on his appeal.

■ Next we will consider the issue relating to the court's finding of a value on the hay crop. Appellant contends there was no testimony as to the value of the hay. We find no merit in this contention. The trial court's finding was based on competent testimony as to the value and amounts of hay. harvested during 1963, 1964 and 1965. On December 1, 1965, appellant padlocked the gates and prohibited the plaintiffs from entering upon the land and thereafter harvested and had exclusive control of the hay and the grounds. If the value of the hay for the years thereafter was less, it was up to appellant to so inform the court. This he failed to do.

■ Issue is taken with the court's findings in regard to putting a definite and accurate value in dollars and cents upon the contribution of each of the parties to the venture in labor, materials, and money.

Recognizing that the trial court was faced with incomplete records, it did have the opportunity to see and hear the witnesses and to weigh their testimony in arriving at its findings. Based on the first years of operation of the joint venture, the court was in a position to make a fairly accurate estimate of what the income of the venture should have been during the years in dispute. Appellant's "Addendum A" presented to the court listing his capital contributions for the years 1966-67-68 shows only the expenses incurred in putting on ths rodeos for those years; the receipts were only known to the appellant. No books, no records, show the receipts of the rodeos, income from concessions or from the entry fees. The appellant alone knows or should know the necessary information on income and expenses for those years and not having kept such records he is estopped from objecting to the court's findings.

The next issue has to do with the court's finding of fact XI which reads:

"The plaintiffs were justified in refusing to make the payments on the note to the Stockmens Bank and in refusing to contribute further to the agreement when the defendant refused to grant them written evidence of their interest in the land and from his failure to account for the income from said land and ventures."

We find no merit to appellant's objection to this finding. His testimony on most matters pertaining to the joint venture was contradictory. The court, therefore, was justified in its findings for until the pretrial conference no accounting was ever offered, such as it was, and even then the court had an extremely difficult time in making sense from the accounting presented.

In view of appellant's testimony on his entire conduct, we find the court was more than kind in its findings of fact, conclusions of law and judgment. The judgment of the trial court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES CASTLES, HASWELL, and DALY, concur.

### ORDER ON HEARING

By order of July 14, 1970 this Court granted rehearing.

On the rehearing oral argument held September 18, 1970, counsel for defendants stressed in both his brief and argument the facts and the failure of the Court to rely on Rosenow v. Miller, 63 Mont. 451, 207 P. 618, as controlling. As to the facts, the trial court had an opportunity to hear the testimony, observe the demeanor of the witnesses and weigh their credibility. Obviously the trial court did not believe the testimony of the defendants and our review leads us to concur in its judgment. As to the Rosenow case, it is clearly distinguishable on the facts and for that reason was not relied upon.

The opinion therefore is affirmed.